UNITED STATES, Appellee,

v.

Russell BANKS, Sergeant
U.S. Army, Appellant.

No. 66,365.
CM 8901184.

U.S. Court of Military Appeals.

Argued Dec. 4, 1991.

Reargued May 6, 1992.

Decided Sept. 30, 1992.

For Appellant: *Captain Teresa L. Norris* (argued and reargued); *Colonel Robert B. Kirby* and *Captain Timothy M. Lawlor* (on brief); *Lieutenant Colonel Russell S. Estey, Major Michael J. Kelleher, Captain Gregory A. Gross.*

For Appellee: *Captain Marcus A. Brinks* (argued and reargued); *Colonel Dayton M. Cramer* and *Major Thomas E. Booth* (on brief).

*Opinion of the Court*

WISS, Judge:

Appellant was tried by a general court-martial composed of officer and enlisted members at Fort Campbell, Kentucky, during March of 1989. Contrary to his pleas, he was found guilty of rape and sodomy, in violation of Articles 120 and 125, Uniform Code of Military Justice, 10 USC §§ 920 and 925, respectively. He was sentenced to a dishonorable discharge, confinement for 9 years, forfeiture of $500.00 pay per month for 108 months, and reduction to pay grade E–1. On July 6, 1989, the convening authority approved the sentence as adjudged. The Court of Military Review affirmed without opinion on January 17, 1991.

This Court granted review on the following issue:

WHETHER THE MILITARY JUDGE ERRED TO THE SUBSTANTIAL PREJUDICE OF APPELLANT BY REFUSING TO ALLOW THE DEFENSE TO REBUT PROSECUTION EVIDENCE, THEREBY DENYING APPELLANT A FAIR TRIAL.

We hold that the military judge erroneously admitted government evidence and excluded critical defense evidence in several particulars: First, he admitted the prosecution psychologist's expert opinion of a family "profile" of child sexual abuse; second, he excluded the defense psychologist's expert discussion of reference authority regarding normal prepubertal vagina size; finally, he excluded a social worker's videotaped interview of the alleged victim. We conclude that the cumulative effect of these errors denied appellant a fair trial.

## I

## BACKGROUND

Appellant was charged with sodomizing and raping his 7–year–old stepdaughter, B. Initially B revealed "secrets" to her child friend. This initiated a chain of events that resulted in charges against appellant.

The trial pitted B against appellant in a credibility battle. B testified against her stepfather by drawing pictures and by primarily nonverbal responses (nodding her head to answer "yes" and shaking her head to answer "no") to leading questions. The substance of her testimony was that appellant "put his penis in" her "private parts" and in her mouth. The prosecution's case included six expert witnesses to prove its case and to bolster B's credibility. On the other hand, appellant testified and denied these acts. The defense presented the testimony of one expert to rebut the prosecution's case and to attack B's credibility.

At the beginning of this case, defense counsel petitioned the court, pursuant to Mil.R.Evid. 615, Manual for Courts–Martial, United States, 1984, to designate Dr. Ralph Charles Underwager, a civilian psychologist and the sole defense expert witness, as a person whose presence was "essential to the defense'[s] presentation" and to permit him "to sit at the defense table during the presentation of the entire government case." Counsel argued, "Since the Government is going to have ... five [expert] witnesses, the defense would like to have Dr. Underwager available to help the defense counsel prepare cross-examina-

tion of these witnesses to challenge their foundations, to challenge their professional expertise." Defense counsel informed the court that, additionally, the defense would offer Dr. Underwager as an expert witness. The following summarizes defense counsel's comments regarding Dr. Underwager's expected testimony in three critical areas:

(1) *Interview techniques, adult pressure, and coercion on the alleged victim that compromised her credibility.*

Dr. Underwager had "reviewed the videotape of an interview of the alleged victim conducted by a government witness, Mrs. Sarah Tucker." He would "testify that the videotape demonstrates a significant level of adult pressure and coercion on the victim sufficient to raise the issue of personal or independent knowledge of the victim. Non-verbal behaviors by the adult also show that pressure was placed on the child." Dr. Underwager would opine "that the use of dolls as an interview technique ... is inappropriate," and "the use of drawings relied upon by different government witnesses ... is not supported by any scientific evidence."

(2) *Professional literature and studies concerning the size of a vagina of a 7–year–old that contradicted the prosecution's case.*

Dr. Underwager would "bring to the court's attention ... literature in the field concerning the physical observations and what is normal, what's the base rate, for the size of a vagina of a 7 year old." He also would "bring to the court's attention ... recent studies that say that the physical observations of a doctor are within the scope—are within normal parameters for nonabused children."

(3) *Sexual abuse accommodation syndrome in rebuttal to the prosecution's case.*

Dr. Underwager would rebut the expected testimony of government witnesses and we are unsure of what the court's ruling is going to be concerning testimony of the sexual

abuse/accommodation syndrome. We believe that the Government will endeavor to use that syndrome and we're prepared to have Dr. Underwager testify that the *Frye* [*v. U.S.*, 293 F. 1013 (D.C.Cir.1923)] standards have not been ever met, that this has not been validated and is not generally reliable.

Defense counsel proffered that the government expert witnesses would

testify that the victim acted or somehow her behavior corresponded to that of most victims and therefore she would be believed inferentially because her behavior was consistent with that demonstrated by many victims. Dr. Underwager is prepared to testify that this so-called syndrome, this method of diagnosing child behavior, is just bunk....

Trial counsel responded by informing the court that the Government did not intend to play the videotape of Ms. Tucker's interview of B and that none of the government witnesses would testify about the interview. Additionally, trial counsel objected to two aspects of Dr. Underwager's expected testimony: (1) Trial counsel argued that Dr. Underwager's testimony about the interview techniques "amount[ed] to ... a human polygraph" and was inadmissible under Mil.R.Evid. 403 and 703. (2) Trial counsel asserted that "Dr. Underwager is not a medical doctor, has received no medical training, and ... is not an expert in the field and should not be allowed to comment on any area having to do with the medical exam or the interpretation of the medical examination of the child or the accused."

The military judge's initial ruling established three parameters for Dr. Underwager's testimony: (1) The doctor would be permitted to testify concerning the impact and effect on children of the adult interview techniques and "his opinion concerning how the use of dolls may influence the child's testimony." (2) Dr. Underwager would be permitted to be in the courtroom only during the testimony of government social workers and psychologists. (3) The military judge refused to permit Dr. Underwager to testify about the medical evidence and stated:

At this point I'm not inclined to allow him to testify concerning the size of seven year old vaginas. You can make an offer; you can—we'll have a 39(a) [session under Article 39(a), UCMJ, 10 USC § 839(a) ] and see what you want to put in if you desire; but at this point I'm not going to allow that.

Also at the threshold of the trial, defense counsel moved to suppress the results of a Minnesota Multiphasic Personality Inventory (MMPI), a psychological test administered to appellant as part of a professional evaluation requested by defense counsel after the allegations of sexual abuse were made. This motion, however, later became moot when the Government abandoned its attempt to introduce the MMPI results after the judge rejected the defense's attempt to introduce Dr. Underwager's opinion, based on the MMPI test results, that appellant did not present the profile of a pedophile. Other facts regarding the defense's attempt to elicit Dr. Underwager's opinion about appellant's psychological profile are discussed more fully below.

After the military judge addressed these and other preliminary evidentiary matters, this contested trial on the merits began. Although both sides introduced significant lay testimony, our factual discussion focuses on the expert testimony that presents the legal issues.

## II

## FACTS

### A. The government experts

During its case on the merits, the Government presented testimony from five expert witnesses: a social worker who was an expert in child sexual abuse (Ms. Jackson); two medical doctors who were experts in pediatrics and child abuse (Drs. Richardson and Moore); a therapist who was an expert in psychotherapy and specialized in the treatment of abused children (Ms. Tucker); and a psychologist who was an expert in child psychology and clinical child psychology (Dr. Smith). Additionally, during its case in rebuttal, the Government

presented the testimony of another medical doctor who was an expert in family practice.

Ms. Mary Jackson, a civilian social worker specializing in the area of child sexual abuse, testified regarding her interviews with B and appellant. Ms. Jackson stated B admitted initially telling her child friend that appellant "had sex with her"; also B confirmed that appellant "put his penis inside her" but told her not to talk "about it." Ms. Jackson explained her interview sessions with B; her use of technical aids including written notes and pictures, anatomically correct dolls; and her interview and questioning techniques. She also testified that appellant "denied" sexually abusing B.

Two medical doctors testified about separate clinical findings based on two different physical examinations of B and about the normal prepubertal vagina size. Dr. (Captain) Leslie A. Richardson, a military pediatrician, examined B in September 1988, one week after the alleged incident, and measured B's vaginal opening as 10 to 15 millimeters. Dr. Richardson opined that B's vaginal opening was far greater in size than 4 to 5 millimeters, the norm for a prepubertal girl, and that the enlarged vaginal opening was "consistent with ... sexual abuse" history reported to her. Dr. Richardson presented her testimony regarding normal vaginal opening size of a child B's age "based on most references." Additionally, trial counsel in questions and Dr. Richardson in answers repeatedly referred to "reference material," "various pediatric journals for reference articles," and "reference works" that address examination and medical findings of sexual abuse and that corroborate the doctor's expert testimony regarding hymenal opening size.

Dr. William R. Moore, a civilian pediatrician who examined B in January 1989 at the request of defense counsel, measured B's vaginal opening as 6 to 8 millimeters. Although he conceded that his examination "showed information that would make you suspect" child abuse, he opined that there was "minimal to no evidence of sexual abuse based on this exam alone." He read directly from his report statements that "[a] hymenal opening greater than 4 millimeters correlates well with sexual abuse in prepubertal girls" and to the effect that his examination was inconclusive because he did not have a patient history and B would not talk.

Ms. Sarah Tucker, a civilian therapist with a Sex Abuse Treatment Team at the Harriette Cohn Mental Health Center, Clarksville, Tennessee, testified about several matters. She repeated B's allegations of sexual abuse by her father, including his putting "his hands in her panties" and "his penis on her...." Ms. Tucker opined without objection that B was truthful. Ms. Tucker explained how she conducted her eleven interview and therapy sessions with B and her use of technical aids including written notes and pictures, a book entitled *The Secret*,[1] anatomically correct dolls, child group therapy, and a videotaped interview.

Ms. Tucker stated that the videotaped interview was conducted at the prosecution's request and was intended to "be used in lieu of [B's] live testimony at an Article 32," UCMJ, 10 USC § 832, session, as Ms. Tucker believed that B "couldn't handle" the proceeding because of "her strong feelings for her father and her mother." This was not "a normal" interview, and it "was handled differently" because it was videotaped. Specifically, Ms. Tucker used ana-

---

1. Dr. Diana McCoy, a clinical psychologist, wrote *The Secret* to serve as a tool for clinicians working with victims of sexual abuse. This 24–page book presents the story of a young girl's trauma from child sexual abuse. The foreword of the book states:

> *The Secret* is a powerful tool to help children who have been sexually abused to identify and resolve their feelings.... The five

year old who hears Jana's story will be able to identify with her feelings of confusion and responsibility and fear....

The prosecution did not offer this book into evidence during Miss Tucker's testimony. However, after the defense expert, Dr. Underwager, criticized use of this book, the military judge, over defense objection, admitted *The Secret* into evidence.

tomically correct dolls in an attempt to have B show what had happened.

Dr. Robert Lee Smith, a civilian clinical and counseling psychologist and expert in child psychology and clinical child psychology, testified about several matters. First, without mentioning the term "sexual abuse accommodation syndrome," he testified about this syndrome to explain the " 'profiles' of families exhibiting" the "dysfunction" of "child sexual abuse" and the behavior of a sexually abused child. Although trial counsel had explicitly informed the judge that this testimony would present " 'profiles' of families exhibiting ... child sexual abuse," neither Dr. Smith nor trial counsel used the word "profile" in the presence of the members.

In presenting this "profile" evidence, Dr. Smith opined that there are "risk factors in homes" which "increase the risk for a child to be the victim of a sex abuse." He identified the following three significant "risk factors": (1) "[T]here is only one biological parent in the family"; (2) "there is a stepfather in the family"; and (3) there is "marital dysfunction" in the family. Dr. Smith explained that dysfunction "is a disturbance within the ways family members interact with each other" and that "sexual dysfunction between the husband and wife" "certainly can be a risk factor."

Second, Dr. Smith testified about "ways to validate these allegations of sexual abuse." He identified physical evidence such as "trauma to the ... vagina" and an "unusual dilatation [presumably meaning dilation] of ... the vaginal canal ...", that would tend to enhance the credibility of the female victim." He did not testify as to what constitutes an unusual dilation, however. Also he discussed child fabrication and stated that it is "very rare" and "very infrequent" for a child under the age of 9 "to render a false allegation."

Defense counsel repeatedly objected to Dr. Smith's testimony concerning what amounted to "sexual abuse accommodation syndrome." Defense counsel made this objection during the Government's case-in-chief and during the direct testimony of

appellant's wife. The record reflects that the following occurred:

[TC]Q: Have you ever been in a violent confrontation with the accused?

[Wife]A: Yes, I have.

DC: Objection, same—same [Defense counsel earlier objected on the basis that the question solicited misconduct not charged.]

MJ: Counsel, what's the relevance at this point?

TC: Your Honor, the Government feels that *it's relevant to the family situation. And the Government intends to put on evidence concerning the child abuse accommodation syndrome as it's known. And the situation in the family, the stress in relationships between family members is critical;* and is relevant in the Government's opinion.

DC: Could we have a side-bar, sir?

MJ: Well, what's the problem that you can't address it from there?

DC: This terminology "child abuse accommodation syndrome" or whatever it is has been moved [sic] on by this court in the past. And *we would prefer not to even let this whole area be brought up.*

(Emphasis added.)

The military judge then excluded the members, and an Article 39(a) session followed. Here trial counsel stated that he did "not intend to bring any uncharged acts of misconduct to go to the character of the accused." Instead, trial counsel averred that he was attempting

to show ... a degree of emotional stress that embodies a number of different acts in the family. One of which was violent tendencies between the accused and his wife that may or may not have been observed by the child. It might contribute to the child feeling a certain amount of stress that might ultimately cause her to act as she's acted in this case. . . .

\* \* \*

The Government expects that evidence will be presented by the Government itself that shows [B] has not always attest-

ed to the facts that she will attest to in court today. And that this—we also have an expert to show that this is not uncommon in cases involving dysfunction within the family. It's the Government's intention to show that there was dysfunction in this family in many different areas; sexual as well as violence in the family, as well as a break down of the appropriate relationship between parent and child. And the Government feels that there is expert opinions in this area that will show that this is appropriate— or is customary in *profiles of families* exhibiting this type of dysfunction; namely, child sexual abuse. So it's a family problem and that, therefore, the Government feels the situation within the family is relevant to this hearing.

The military judge then inquired, "[T]his child abuse accommodation syndrome.... What are you talking about? The evidence—What evidence are you going to try to bring up to show what?" Trial counsel responded:

Your Honor, it is intended that this witness, as well as other witnesses, will testify to the fact there was dysfunction in this family in a number of different areas. Sexually, there was dysfunction between the wife and the husband, the accused. That there might well have been [family problems].

The military judge had trial counsel confirm that this evidence would relate to "family problems," and "[n]ot specifically with the accused, but just family problems." The military judge then ruled that he would

allow the witnesses to testify about evidence of any violent confrontation without specific [instances] being drawn out. And I will instruct the members accordingly at the appropriate time as to what evid—what use can be used. That is for its tendency if any to show the family situation as to explain why the incidents may occur. If that becomes relevant.

At this point defense counsel again objected "[w]ith regards, sir, to the use of the phraseology 'sexual abuse accommodation

syndrome' which the defense will object to any of that." However, the military judge and trial counsel then had the following exchange:

MJ: My understanding is that that's— correct me if I'm wrong—from trial counsel's offer, what it's going to show is that psychological studies have shown ... that in families that have areas of dysfunction, these areas of dysfunction—What that they—that sexual child abuse has been known to occur; is that it?

TC: Sir, that there are—there is evidence that can be deducted [sic] from looking at the family that would tend to indicate that certain behavior by a child is expected. While it might seem surprising to people that are not familiar with this area of the law and psychology—

MJ: So this—this syndrome is going to apply only to the child's behavior?

TC: Well, sir, I think it applies broader than that. To the behavior of—

MJ: Well, this is what I want to hear. What are you going to try to introduce it to? And that's what I want to understand. 'Cause what you're talking about—Also, [what] I'm looking at is are we bringing up character evidence of the accused which is inadmissible. In other words are you going to bring up that the accused has a profile of a sexual offender because he does a, b, c, and d; in which case then that is inadmissible. Because you can't bring up a character trait to prove that the individual acted in conformity with that.

TC: Well, sir, while the Government doesn't intend to do that at this point. *The Government intend[s] to put on character traits within the Banks family to show that this is consistent with a profile of a family experiencing this type of—*

MJ: Okay. When you're saying "character traits within the Banks family" ... *i.e.* dysfunctions ... between husband and wife, ... between children, children assuming parental roles. Things of that nature rather than specifically saying

that because the accused does a, and the accused does b, therefore he's a sex offender.

TC: It is not the Government's intention at this point to use the child abuse accommodation theory in your example, sir.

\* \* \*

MJ: Okay. I will allow the testimony but I'm not going to allow specific instances of conduct by the accused. I will allow trends or instances without being specific as to the nature on direct examination.

DC: Are you going to use that—permit the use of that phrase [child abuse accommodation theory], either now or social workers later on?

MJ: If social workers want to testify concerning the phrase, yes; I'll allow the phrase. So if the doggone phrase of rape trauma syndrome has been recognized as an acc—as an admissible phrase and acceptable in the area.

DC: We'd like to attack it on a *Frye* basis that it's not commonly accepted.

MJ: Well, then [when] the Government tries to quote "present the evidence" of this syndrome, they'll lay the foundation at that point. What I'm saying is that it's not *per se* inadmissible.

(Emphasis added.)

### B. *The defense expert*

A major dimension of the defense case to rebut the Government's expert-witness presentation was the testimony of one defense expert, Dr. Ralph Charles Underwager, a clinical psychologist. At the beginning of its case-in-chief, defense counsel requested permission of the court to show the members the videotape of Ms. Tucker's interview of B. Trial counsel objected based on Mil.R.Evid. 403 that the videotape was "confusing to the panel"; "cumulative on the issue of a prior inconsistent statement and tend[ed] to give unfair weight to that inconsistent statement and [was] clearly ... irrelevant." To support his position, defense counsel stated:

The *purpose is to have Dr. Underwager review the tape and be able to point out to the court members* just what types of actions by Mrs. Tucker are consistent with the defense['s] theory that the victim has been given certain cues, has learned a certain behavior; that in fact she has had her story bolstered, not bolstered but solidified by the type of questioning and interrogation conducted by the Government and by the private social workers and psychologists.... We believe it's important for the court to—for the members to see exactly what type of investigative techniques were employed by Mrs. Tucker. Mrs. Tucker said that she asked open ended questions, non-suggestive, non-threatening environment, and we'd like the court members to see the tape.... [L]et the members see for themselves what type of interview technique Mrs. Tucker used. Certainly it *would be more graphic and better than to have Dr. Underwager just give his impression to the panel.* We'd point out that his conclusions do not make it clear to the members.

(Emphasis added.).

The military judge denied the defense motion and refused to permit the members to view the videotape, stating:

It's denied on the basis, number one, when the testimony of Mrs. Tucker was taken she testified that the video tape session was not the normal session, that she purposely had done this session with the intent of using this as [B's] testimony before the Article 32 investigation if they did not feel the child could go through such an investigation; therefore, it was not a normal session in an attempt to try and make the child talk rather than the normal counseling session. I think to watch that would be misleading and would mislead the court and give them the wrong idea....

Accordingly, the videotape was not shown to the members but was appended to the record as an appellate exhibit.

Unsuccessful in its attempt to utilize the videotape, the defense opened its case by

presenting Dr. Underwager "as an expert in the following areas: clinical psychology, therapy, child development, child sexual abuse, and as a scientist." After cross-examining this witness as to his qualifications for seven pages in the record, trial counsel did not object to the court's recognizing Dr. Underwager as an expert in any of these areas, and, accordingly, Dr. Underwager testified as an expert.

First he repudiated Dr. Smith's earlier testimony regarding "sexual abuse syndrome." Dr. Underwager expressly rejected Dr. Smith's testimony as to "risk factors" of "family dysfunction" and child sexual abuse. He testified that there are no "risk factors" but only "incidence figures" of child sexual abuse. Conceding "that there is relatively high incidence of sexual abuse when there's a stepfather in the home," he did "not translate" this incidence "into a risk factor." He explicitly denied that there is any correlation between "marital dysfunction" and child abuse. In effect, Dr. Underwager rebutted the prosecution's "profile" of child sexual abuse. Additionally, in detailed testimony, he challenged other aspects of the sexual abuse syndrome.

Second, the defense attempted to elicit Dr. Underwager's "opinion" and "interpretation" of appellant's test scores on the MMPI. Dr. Underwager was prepared to testify that appellant's "responses were in the normal range and not indicative of the

traditional profile of a pedophilia—pedophile." At this point trial counsel informed the military judge that the Government had abandoned its earlier intention to introduce the MMPI and now objected to this evidence based on Dr. Underwager's lack of "information concerning the" circumstances surrounding administration of the test.

The military judge sustained trial counsel's objection based on Mil.R.Evid. 403, stating:

> Basically what we're talking about here then is a general character trend—a character trait not a specific trait. The court finds under 404, it would not be admissible, but even if there were some relative admissibility relevance, I find that it would be much more confusing rather than helpful and I will not allow it.

Thereafter, both defense and trial counsel made offers of proof relative to Dr. Underwager's opinion testimony based on the MMPI.[2]

A third major thrust of the defense expert evidence was an attempt to have Dr. Underwager testify about "studies in the area of the normal vaginal sizes." When trial counsel objected to Dr. Underwager's testimony, the defense proffered that it was to rebut the Government's case and Dr. Smith's testimony concerning "physical evidence" of child abuse. The military

---

2. Defense counsel questioned Dr. Underwager to establish the following: (1) Dr. Underwager reviewed the MMPI previously administered to appellant. (2) This test is "by far the most valid and reliable assessment device available, and ... 40 years of research demonstrate that. It's much better than clinical judgment. It's very solid information." (3) There is ... significant research ... going back to 1954, on the MMPI responses [behavior patterns] of known pedophil[e]s and known incest perpetrators." By comparing the MMPI responses of any person to the MMPI responses of known child molesters, a psychologist can say whether a person "demonstrates the behavior patterns of" a pedophile. "This doesn't prove whether or not a person ... did it, but it certainly has an impact on the issue of the probability." Moreover, if a person does not demonstrate the behavior pattern of a pedophile, "the probability is much

less" that the person is a pedophile. (4) Appellant's MMPI results were "within normal image profile ... it's not the kind of MMPI profile produced by known child molesters."

Trial counsel made the following offer of proof to rebut Dr. Underwager's testimony: (1) If Dr. Underwager were to testify, the Government would present Dr. Minetos, the psychologist who administered the test. Dr. Minetos "would express ... concern over the performance of the accused on that test," but opine that appellant's performance on the MMPI "would not be determinative on the issue of whether or not he abused his child." (2) Additionally, Dr. Smith would state that using "this MMPI [to] diagnos[e] the accused would be indeterminate and ... inappropriate." Based solely on the MMPI, he could not render an opinion on whether appellant abused his child.

judge stated he would permit the defense "to address the issues. I'll allow the medical testimony, but I'm not going to allow Doctor Underwager to testify about it." Thereafter, defense counsel again was permitted to make an offer of proof regarding the proffered opinion testimony.[3]

Fourth, before the members Dr. Underwager testified about the impact of interview techniques and therapy treatment on B's credibility. Initially, he addressed his "basic concern" about the "amount and the nature of adult social influence." This included "verbal behavior, very leading questions, suggestive questions, reinforcement when the child gives a desired response or ignoring a child; doing nothing when the child gives an undesired response."

Addressing the videotaped interview, Dr. Underwager opined that "Miss Tucker does put very significant pressure on the child; coercive pressure to respond as desired." As the doctor attempted to address Ms. Tucker's response to B's denials of sexual abuse, the military judge instructed him to "limit your response to what you saw with the effects on the child and the attempts by the individual without giving specific examples." Dr. Underwager opined that Ms. Tucker's use of the book *The Secret* has "a very powerful modeling effect" to induce a child that "has not been abused" to admit a secret of child abuse.[4] He also opined that Ms. Tucker's use of dolls in the video "is a very powerful modeling effect." His evaluation and criticism of the videotaped interview further included comments about B's physical appearance and word selection.

## C. The government expert in rebuttal

Dr. (Major) Blane Crandall, a military staff physician with a background in obstetrics and gynecology, family practice, and child sexual abuse examination, testified in rebuttal as a government expert witness in family practice. At the request of the legal office, Dr. Crandall examined B on February 2, 1989. The doctor measured her vaginal opening at 9 millimeters, which he opined was greater than the 4 to 5 millimeters "normally expect[ed]" in a girl B's age. On cross-examination, Dr. Crandall conceded that he was not familiar with "current literature" written by specific authors. In response to questions by the judge, Dr. Crandall opined that he was "ninety to ninety-five percent" certain that "there was vaginal penetration" of B, but he could not state the cause.

### III

### DISCUSSION

At the outset, two preliminary observations are appropriate. First, it has been recognized that child sexual abuse cases are among the most difficult to prosecute and to defend. This is evident to advocates and to courts facing issues arising from the competing societal interest in protecting young children from the trauma of testifying against an abusive parent or adult and an accused's Sixth Amendment right to confront and to cross-examine witnesses.[5]

---

3. Defense counsel questioned Dr. Underwager to establish the following: (1) Dr. Underwager was "familiar with ... studies that have been conducted within the last five years concerning ... normal vagina sizes ... [of] prepubertal females." These studies "include: Emens; 1986, Pecorny; 1987, and the 'American Journal of Childhood Diseases,' John McCann; 1988...." (2) Pecorny observed "that the size of a vaginal orifice or the hymenal opening cannot be used by itself for any determination or any conclusion that penetration has occurred. The variability is simply too great." (3) There is no support for "the statement in Hoffman's pediatrics text in 1954, that [a] hymenal opening of 4 millimeters was normal." (4) Dr. Underwager challenged the examination methods used in the McCann study and the Cantwell study group. (5) In response to the question, "[W]ould a finding of 9 millimeters or between 10 and 15 millimeters [of the introital opening (the external size of the vaginal orifice)] be significant based upon [his] reading of those studies?[,]" Dr. Underwager answered in the negative but did not state what that significance would be.

4. As already noted, the judge admitted the book, *The Secret,* into evidence over defense objection. *See* n. 1, *supra.*

5. *See, e.g., White v. Illinois,* —— U.S., ——, 112 S.Ct. 736, 116 L.Ed.2d 848 (1992); *Maryland v. Craig,* 497 U.S. 836, 110 S.Ct. 3157, 111 L.Ed.2d 666 (1990); *Idaho v. Wright,* 497 U.S. 805, 110

Use of expert testimony in these child sexual abuse cases is another "legal thicket," for the expert testimony is extremely complex and often novel.[6] In many respects, child abuse litigation is a new frontier with a plethora of cases in all jurisdictions addressing provocative issues. *See generally* McCord, *Syndromes, Profiles and Other Mental Exotica: A New Approach to the Admissibility of Nontraditional Psychological Evidence in Criminal Cases*, 66 Or.L.Rev. 19 (1987).

Second, the single granted issue in this case invites review of several of the military judge's rulings regarding expert testimony. It is critical at the threshold of this analysis to appreciate that the precise issue here is whether any of the following evidence was admissible: the prosecution psychologist's *expert opinion* of a family situation presenting the "profile" of child sexual abuse; the defense psychologist's *expert opinion* that the accused did not present the profile of a pedophile; the defense psychologist's *expert discussion* of the "literature in the field" and "studies" regarding normal prepubertal vagina size; and the social worker's video interview of B to permit the members to evaluate alleged government manipulation of her.

What is *not* at issue is whether any of the following evidence was admissible: evidence of sexual abuse accommodation syndrome; test results of the MMPI; the defense psychologist's *expert opinion* regarding normal prepubertal vagina size; and B's statements during the social work-

er's videotaped interview as substantive evidence to prove the truth of B's recantation and contradictions. These evidentiary matters were not raised at trial or on appeal before this Court. They are waived, and we need not address them. Mil.R.Evid. 103. In identifying and eliminating these issues, we better focus on the four narrow and specific evidentiary matters presented, and we address them seriatim.

### A. Admission of the Prosecution's Profile Evidence

Appellant contends the military judge erred by excluding the defense psychologist's *expert opinion* that the accused did not present the profile of a pedophile. This issue arises only because the military judge first admitted the prosecution psychologist's *expert opinion* of a family situation presenting the "profile" of child sexual abuse. Appellant argues the defense evidence is proper rebuttal. Recognizing this relationship between the government and defense evidence (admission of the prosecution evidence is the predicate for the claimed admission of the defense rebuttal), we are required first to evaluate admissibility of the prosecution's profile evidence.

Liberal standards for admissibility of expert testimony have been codified. Mil. R.Evid. 702–05.[7] Trial courts have seen, therefore, a veritable explosion in use of expert testimony. Our Court is concerned with the so-called "battle of the experts," which is a waste of time, unnecessary, or

S.Ct. 3139, 111 L.Ed.2d 638 (1990); *United States v. Romey*, 32 MJ 180 (CMA 1990), *cert. denied*, — U.S. —, 112 S.Ct. 337, 116 L.Ed.2d 277 (1991); *United States v. Ferdinand*, 29 MJ 164 (CMA 1989), *cert. denied*, 493 U.S. 1044, 110 S.Ct. 840, 107 L.Ed.2d 835 (1990); Graham, *The Confrontation Clause, the Hearsay Rule, and Child Sexual Abuse Prosecutions: The State of the Relationship*, 72 Minn.L.Rev. 523 (1988).

**6.** *See United States v. King*, 35 MJ 337 (CMA 1992); *United States v. Stinson*, 34 MJ 233 (CMA 1992); *United States v. Rhea*, 33 MJ 413 (CMA 1991); *United States v. Stark*, 30 MJ 328 (CMA 1990).

**7.** For example, Mil.R.Evid. 702 allows expert testimony whenever it "will assist the trier of fact." *See, e.g., United States v. Stinson* and

*United States v. Stark*, both *supra*; *United States v. Hammond*, 17 MJ 218 (CMA 1984). Mil. R.Evid. 703 "expands the bases upon which expert opinion may rest." S. Saltzburg, L. Schinasi, & D. Schlueter [hereafter Saltzburg], *Military Rules of Evidence Manual* 738 (3d ed. 1991) (Editorial Comment); *United States v. Hammond, supra*. Also barriers to expert opinion, such as the ultimate-issue rule, have been abolished. Mil.R.Evid. 704; *United States v. Hill-Dunning*, 26 MJ 260 (CMA), *cert. denied*, 488 U.S. 967, 109 S.Ct. 494, 102 L.Ed.2d 531 (1988). Finally, in limited circumstances "the underlying facts or data" may be disclosed. Mil.R.Evid. 705; *United States v. Jones*, 26 MJ 197, 200 (CMA 1988).

confusing.[8] Mil.R.Evid. 403 is the appropriate tool for a military judge to use to handle this problem.[9]

■ Mil.R.Evid. 702–705 and 403 operate to establish a simple four-part test for admissibility of expert testimony: (1) Was the witness "qualified to testify as an expert"? (2) Was the testimony "within the limits of [the expert's] expertise"? (3) Was the "expert opinion based on a sufficient factual basis to make it relevant"?, and (4) "Does the danger of unfair prejudice created by the testimony outweigh its probative value?" *United States v. Stinson*, 34 MJ 233, 238 (CMA 1992); *United States v. Neeley*, 25 MJ 105, 107 (CMA 1987), *cert. denied*, 484 U.S. 1011, 108 S.Ct. 710, 98 L.Ed.2d 660 (1988).

■ We assume—without deciding—that the first three factors are met with regard to the prosecution psychologist Dr. Smith's *expert opinion* of a family situation presenting the "profile" of child sexual abuse. However, we conclude that the military judge erred in permitting expert opinion on the issue of appellant's guilt or innocence, for "the danger of unfair prejudice" greatly "outweighed" "its probative value." Mil.R.Evid. 403.

We are not concerned here with scientific evidence that federal and state courts have admitted into evidence, such as blood tests, ballistics analysis, or fingerprint analysis. *See generally* E. Imwinkelried, P. Giannelli, F. Gilligan, & F. Lederer, *Courtroom Criminal Evidence* § 605 at 119 (1987). The prosecution in this case offered a characteristic "profile" to present appellant's family situation as ripe for "child sexual abuse." In effect, this profile purported to present the characteristics of a family that included a child sexual abuser.

■ Generally, use of any characteristic "profile" as evidence of guilt or innocence in criminal trials is improper. This Court previously has held that it was error for the Government to permit a counselor in the Navy's Family Advocacy Program to testify about a "profile of the 'usual' sexual child abuser." *United States v. August*, 21 MJ 363, 364 (CMA 1986). We have reaffirmed this holding and stated that it is error to admit testimony that an appellant's psychological profile was *consistent* with that of a person who sexually abused children. *United States v. Garcia*, 25 MJ 159 (CMA 1987). The holding of these cases is rooted in Mil.R.Evid. 404(a)(1) that precludes the prosecution from introducing character evidence of an accused who has not put his character at issue. We agree with Judge Cox's analysis in *August* that explicitly rejected use of a profile "to show that it was more likely than not that appellant sexually abused the victim." 21 MJ at 364.

Our holding in *August* is consistent with the case law in both federal and state courts that has severely criticized attempts to introduce "profile" evidence to establish either guilt or innocence.[10] Our system of justice is a trial on the facts, not a litmus-paper test for conformity with any set of characteristics, factors, or circumstances. In rejecting the use of another type of criminal profile (drug-courier profile) as evidence of guilt in criminal cases, the Eleventh Circuit has perceptively pointed out:

> Drug courier profiles are inherently prejudicial because of the potential they have for including innocent citizens as profiled drug couriers.... Every defendant has a right to be tried based on the evidence against him or her, not on the techniques

---

8. *See, e.g., United States v. Partyka*, 30 MJ 242 (CMA 1990); *United States v. Neeley*, 25 MJ 105 (CMA 1987), *cert. denied*, 484 U.S. 1011, 108 S.Ct. 710, 98 L.Ed.2d 660 (1988); *United States v. Petersen*, 24 MJ 283 (1987); *United States v. Cameron*, 21 MJ 59 (CMA 1985).

9. *United States v. Partyka* and *United States v. Neeley*, both *supra*; Saltzburg, *supra* at 439 (Editorial Comment).

10. *United States v. Beltran–Rios*, 878 F.2d 1208 (9th Cir.1989); *United States v. Gillespie*, 852 F.2d 475 (9th Cir.1988); *United States v. Khan*, 787 F.2d 28 (2d Cir.1986); *United States v. Hernandez–Cuartas*, 717 F.2d 552 (11th Cir.1983); *United States v. Taylor*, 716 F.2d 701 (9th Cir. 1983); *State v. Percy*, 146 Vt. 475, 507 A.2d 955 (1986); *Sloan v. State*, 70 Md.App. 630, 522 A.2d 1364 (1987).

utilized by law enforcement officials in investigating criminal activity. Drug courier profile evidence is nothing more than the opinion of those officers conducting the investigation. . . . [W]e denounce the use of this type of evidence as substantive evidence of a defendant's innocence or guilt.

*United States v. Hernandez–Cuartas,* 717 F.2d 552, 555 (1983). We find this reasoning persuasive in evaluating admissibility of the Government's "profile" offered in the present case, and we also "denounce the use of this type of evidence as substantive evidence" of appellant's guilt, just as we did in *August.*

■ This is not to say that "profile" evidence is never admissible. On the contrary, "profile" evidence is admissible—but only in narrow and limited circumstances. First, it is admissible as purely background material to explain sanity issues. *See United States v. Neeley,* 25 MJ 105 (CMA 1987). Second, it is admissible as an investigative tool to establish reasonable suspicion. *See United States v. Sokolow,* 490 U.S. 1, 109 S.Ct. 1581, 104 L.Ed.2d 1 (1989). Third, it may be admitted in rebuttal when a party "opens the door" by introducing potentially misleading testimony. *United States v. Wilson,* 930 F.2d 616 (8th Cir. 1991); *United States v. Beltran–Rios,* 878 F.2d 1208 (9th Cir.1989).

Applying these principles to the present facts, we conclude that the military judge erred in permitting trial counsel, over the objection of defense counsel, to present expert opinion regarding a profile of child sexual abuse. Here, as in *August,* an expert presented a "profile" of criminal conduct to prove appellant's guilt.[11] The prosecution established that appellant and his family fit the profile because appellant was a stepfather who did not have a "good" marital sexual relationship. Trial counsel then used Dr. Smith to opine that this sexual dysfunction would be a significant factor "increas[ing] the risk" of child sexual abuse in the family.

Throughout this case, the prosecutor orchestrated this "profile" evidence to persuade the members that appellant fit the profile and was a child molester. In his opening statement, trial counsel stated:

There was some amount of trouble in the home, in the family, the marriage. There were problems between Mrs. Banks and the accused. There was sexual dysfunction as the sociologists and psychologists like to say.

In closing argument on the merits, trial counsel again revisited this matter:

Sexual dysfunction in the family? The evidence has been presented, and you heard Mary Fran Jackson talk about that, that both—that when she received a history from the family members there was a history of long-term dysfunction sexually between Sergeant Banks and Patricia [appellant's wife]. *Consistent with what you would expect to find in families where the dad is abusing the child.*

But we're not trying to prove our case that way. We're not trying to say that because all the facts are there that therefore B was raped by her dad. We're not saying that; not at all. . . .

(Emphasis added.)

Trial counsel's statement that "we're not trying to prove our case that way" is disingenuous. The last paragraph of this argument is a futile and transparent attempt to purge the taint of what he had just done. His argument that the "history of long-

---

11. The government tactic was to use a simple syllogism (major premise, minor premise, and conclusion) to persuade the members that appellant was a child abuser. *See generally* Imwinkelried, *The "Bases" of Expert Testimony: The Syllogistic Structure of Scientific Testimony,* 67 N.C.L.Rev. 1 (1988). Through the expert testimony of Dr. Smith, the Government presented the major premise—families with the "profile" of the three identified risk factors present an increased risk of child sexual abuse. Through lay and expert testimony, the prosecution established the minor premise—appellant and his family fit the profile because appellant was a stepfather who did not have a "good" marital sexual relationship. This led to the conclusion that appellant was a child abuser—a conclusion argued by trial counsel based on the major and minor premises.

term [marital] dysfunction sexually" was "[c]onsistent with what you would expect to find in families where the dad is abusing the child" is an implicit reference to the sexual abuse "profile" Dr. Smith had presented.

Trial counsel's argument belies any assertion that this profile was offered for any other purpose than to prove appellant's guilt. In fact, trial counsel never argued the profile or risk-factors evidence for any other purpose, such as to support the credibility of the alleged victim or to explain her admitted unusual behavior. The prosecution's strategy of presenting a "profile" and pursuing this deductive scheme of reasoning and argument to prove that appellant is a child sexual abuser was impermissible. *See United States v. August* and *United States v. Garcia*, both *supra, see* 36 MJ at 161–162.

The military judge fully understood that profile evidence is inadmissible. However, he mistakenly admitted this profile evidence because he erroneously assumed that the proffered profile involved only family traits in general and not traits of the accused. Inadmissible profile evidence does not merely address a profile where the factors relate only to a "character trait" of the accused. The factors in the profile may be *any information or data* so as to place appellant in an alleged "group" of persons who have committed offenses in the past.

The argument usually follows that a defendant who shares common characteristics of the group is likely to have acted the same with respect to the crime charged. For example in *August,* two elements of the profile were not "character traits" of the accused—a person's pay grade (E–6) and time in service ("about fifteen years or more in"). Nonetheless, we concluded that presentation of the "profile" was impermissible. Therefore, in the present case, the military judge reasoned incorrectly that exclusion of profile evidence concerned only a

profile based on "character traits of the accused." [12]

■ In evaluating the significance of this error, we acknowledge that the military judge permitted Dr. Underwager to challenge the expert testimony of Dr. Smith regarding this "profile" evidence. However, we do not consider that this rebuttal evidence fully purged the taint of the inadmissible "profile" evidence.

Also we have considered the "generality" of this "profile" in that the risk factors were broadly defined. *United States v. August, supra* at 365 (Everett, C.J., concurring). In essence, the Government's "profile" of a family ripe for child sexual abuse was one where there is no normal sexual relationship between the parents and where there is a stepfather in the family.

Concededly, these two factors, outside of the context of this trial, appear to be of dubious value to prove the offenses of rape and sodomy. However, we do not evaluate the impact of this profile evidence in a vacuum. Instead, we evaluate prejudice regarding the profile in this case in light of the Government's earlier-quoted *reliance* on the "profile" to prove its case.

We conclude that the psychological "profile" evidence should never have been introduced and presented to the members for their consideration. We do not take issue with trial counsel's attempt to establish or to argue relevant adjudicative facts—for example to prove appellant's alleged marital sexual dysfunction to establish a motive for these offenses. We find error, however, in trial counsel's use of *expert opinion* to proffer to the members a characteristic "profile" of child sexual abuse and then reliance on this "profile" to bolster the Government's case to establish appellant's guilt. This error is compounded by the military judge's instructing the members to consider "the factors which increase the

---

12. We note that one of the "risk factors" ("there is a stepfather in the family") in the presented profile did relate to this accused. While this risk factor is a family characteristic, it also is a characteristic of appellant—his position as stepfather.

probability of sexual abuse in the family." [13]

### B. Exclusion of the Defense Expert Opinion Regarding Pedophile Profile Evidence

■ Our reasoning regarding inadmissibility of the government "profile" evidence is equally applicable to our review of the military judge's excluding Dr. Underwager's expert opinion. We can, therefore, quickly resolve this issue.

To rebut the prosecution's expert evidence that the accused's family situation presented the "profile[ ]" of "child sexual abuse," the defense offered Dr. Underwager's opinion, based on the results of the MMPI, that appellant did not present the profile of a pedophile. We have considered the possibility that the evidence may have been admissible in rebuttal once the Government introduced "profile[ ]" evidence and thereby had "opened the door" to this line of inquiry. Federal courts have permitted the Government to use "criminal profile testimony" to rebut potentially misleading testimony.[14] If a party attempts to prove its case by "profile" evidence, the military judge has the discretion to permit the opposing party to respond with evidence when the opponent "opens the door." [15] However, here this evidence was not admissible in rebuttal, for defense counsel failed to establish that Dr. Underwager's expert opinion rested on a reliable basis.

Mil.R.Evid. 703 states:

The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert, at or before the hearing. *If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence.*

(Emphasis added.) The Editorial Comment in *Military Rules of Evidence Manual, supra* at 738, advises that *reliability* of information with experts in the particular field is the test for determining a proper basis for expert opinion testimony. We will, therefore, examine appellant's offer of proof to determine if he demonstrated a reliable basis for Dr. Underwager's novel expert opinion.[16]

---

13. If the Government had offered the evidence for any of the narrow reasons set out earlier—some purpose *other* than to prove appellant's guilt as he fit the "profile"—a proper limiting instruction would have been necessary. No such instruction was given here. On the contrary, from opening statement through findings instructions, trial counsel exploited this impermissible "profile" evidence. The general rule excluding "profile" pertains in the present case, and none of the recognized exceptions to this rule justifies admission of this "profile" evidence.

14. *See, e.g., United States v. Beltran–Rios,* 878 F.2d at 1213 (drug courier profile evidence admissible as rebuttal of defense claim defendant "was a poor man"); *United States v. Khan, United States v. Hernandez–Cuartas, United States v. Taylor, all supra, see* 36 MJ at 161 n.10.

15. Our adversary system permits fighting "fire with fire" to ensure a fair trial. This includes permitting a party to introduce otherwise inadmissible but nonetheless reliable evidence if a party "opens the door" wide for rebuttal. *See McCormick on Evidence* § 57 at 229 (4th ed. 1992) (discussing "Fighting Fire With Fire: In-

admissible Evidence as Opening the Door"); 1 Wigmore, *Evidence* § 15 at 731 (Tillers rev. 1983) (discussing the doctrine of "curative admissibility"); *see United States v. Shields,* 20 MJ 174, 177 (CMA 1985) (Everett, C.J., concurring in the result); *United States v. Haimson,* 5 USCMA 208, 224 n.2, 17 CMR 208, 224 n.2 (1954). Although we conclude here that the military judge was not required to permit the defense evidence in rebuttal, if this evidence had been admitted, we would be more reluctant to find prejudice to appellant's case from admission of the prosecution's profile evidence.

16. Mil.R.Evid. 103(a)(2) states:

Error may not be predicated upon a ruling which admits or excludes evidence unless the ruling materially prejudices a substantial right of a party, and

\* \* \*

2) *Offer of proof.* In case the ruling is one excluding evidence, the substance of the evidence was made known to the military judge by offer or was apparent from the context within which questions were asked.

This Court will specifically rely on counsel's offer of proof to "demonstrate the probative value of such evidence," *United States v. Elvine,*

In *United States v. Gipson*, 24 MJ 246 (CMA 1987), addressing the reliability of scientific evidence, this Court permitted the proponent of scientific evidence to rely on both legal precedent where similar evidence had been admitted and scientific acceptance to establish the reliability of evidence. Evaluating the proffered opinion in light of these principles, we conclude that there was not a sufficient offer of proof to establish the reliability of the defense-proffered evidence.

Both federal and state courts have almost unanimously rejected opinion evidence of the type tendered by appellant.[17] Even more significant, there was no show-

ing here that expert opinion regarding these matters was generally accepted by psychiatrists, psychologists, or others in the medical community. On the contrary, the record presents a conflict of expert opinion on whether the MMPI in and of itself was determinative to show pedophile traits.[18] Notwithstanding Dr. Underwager's presentation of the MMPI test in general as "the most valid and reliable assessment device available," there is credible expert opinion that the MMPI is not a reliable tool to predict pedophilia in particular.[19]

We are also especially concerned about the accuracy of the MMPI to identify a

16 MJ 14, 16 (CMA 1983). *See also United States v. Means*, 24 MJ 160 (CMA 1987); *United States v. Heatherly*, 21 MJ 113 (CMA 1985).

17. *See, e.g., United States v. Gillespie*, 852 F.2d 475 (9th Cir.1988); *Pendleton v. Commonwealth*, 685 S.W.2d 549, 553 (Ky.1985); *State v. Hansen*, 304 Or. 169, 176, 743 P.2d 157, 161 (1987); *State v. Friedrich*, 135 Wis.2d 1, 16–17, 398 N.W.2d 763, 770 (1987); *People v. Watkins*, 176 Mich.App. 428, 430, 440 N.W.2d 36, 37–38 (1989); *State v. Roberts*, 393 N.W.2d 385, 388 (Minn.App.1986); *Williams v. State*, 649 S.W.2d 693, 695–96 (Tex.App. 7 Dist.1983).

Taking a contrary view, the California Supreme Court has permitted such evidence. *People v. Stoll*, 49 Cal.3d 1136, 265 Cal.Rptr. 111, 127, 783 P.2d 698, 714 (1989). We note, however, that *Stoll* involved psychological evidence which did not include a profile, and the court's decision rested in large part on state common law and statutory law which specifically permits persons accused of lascivious acts to tender proof of sexual nondeviance. *Id.* at 1152–53, 265 Cal.Rptr. at 121, 783 P.2d at 707–08. *See also People v. Ruiz*, 222 Cal.App.3d 1241, 1245–46, 272 Cal.Rptr. 368, 371–72 (1990) (construing *Stoll* narrowly, profile evidence held not admissible without showing of reliability on remand). While *Ruiz* admitted "psychological opinions based on personal examination and an analysis of accepted psychological tests, such as the MMPI and MCMI [Millon Clinical Multiaxial Inventory] ... as character evidence tending to show that an individual was or was not likely to have committed a particular act," 222 Cal. App.3d at 1244, 272 Cal.Rptr. at 370, we read neither *Ruiz* nor *Stoll* to permit a psychologist to opine that the defendant did not have the psychological profile of a person suffering from pedophilia. However, we note that *Ruiz* was

remanded to permit the defendant an opportunity to establish the reliability of this evidence.

18. The MMPI test is frequently used for psychological personality testing in the United States. The MMPI test was developed in 1930 and has been modified a number of times. It consists of a total of 566 questions to which the subject answers "true" or "false." Several different scores are computed arithmetically. From examining the answers to these items, a psychologist can determine four different validity scales and ten clinical scales, which include such items as depression and social introversion. D. Shuman, *Psychiatric and Psychological Evidence* 54–56 (1986). This testing, together with client interviews, provides the basis for psychological opinion. The argument for the reliability of the MMPI test rests entirely on the statistical correlation between given patterns of scores and known personality traits. *See, e.g.,* D. Shuman, *supra* ch. 2; *People v. Stoll*, 265 Cal.Rptr. at 117–19, 783 P.2d at 704–06; *People v. Ruiz*, 222 Cal.App.3d at 1245, 272 Cal.Rptr. at 371. We recognize that the MMPI is generally accepted as helpful in aiding the psychological diagnosis. Our concern is that this record does not establish that the MMPI is "sensitive" to identify the pedophile or that appellant's MMPI is a reliable tool in evaluating him.

19. "[T]here is no psychological test or device that reliably detects persons who have or will sexually abuse children. Thus, it is appropriate to conclude that, under the current state of scientific knowledge, there is no profile of a 'typical' child molester." Myers, Bays, Becker, Berliner, Corwin, & Saywitz, *Expert Testimony in Child Sexual Abuse Litigation*, 68 Neb.L.Rev. 1, 142 (1989). *See also* J. Selkin, *The Child Sexual Abuse Case in the Courtroom* 323 (2d ed. 1991).

child molester. There is nothing here to demonstrate how often the test correctly identifies what it purports to evaluate or the margin of error in the results. *See United States v. Gipson, supra.* Equally important, Dr. Underwager made no explanation of the significance of his findings. He did not explain how closely appellant's responses matched a profile on which he based his expert opinion—whether appellant fit squarely in a standard category or whether the psychological evaluation was more tentative. Moreover, Dr. Underwager provided no information about the administration of this test, although the record presents a dispute concerning the unexplained circumstances surrounding administration of the examination.

In sum, defense counsel failed to elicit a satisfactory explanation from Dr. Underwager or to introduce legal precedent, scientific evidence, or technical literature as part of the offer of proof that this MMPI profile evidence was reliable as the basis of Dr. Underwager's proffered opinion. Our holding on the inadmissibility of the defense profile evidence is a narrow one—here defense counsel failed to establish a reliable factual basis for the proffered expert opinion of Dr. Underwager to identify a pedophile based on a post-allegation MMPI. *See* Mil.R.Evid. 703; *United States v. Stinson,* 34 MJ 233 (CMA 1992). Therefore, the military judge was within his discretion to exclude it, as its probative value was outweighed by the danger of confusing the issues, misleading the court members, or wasting time. Mil.R.Evid. 403. *See State v. Miller,* 709 P.2d 350 (Utah 1985).

**20.** After attending a Lutheran preparatory school and a Lutheran seminary, he obtained a Ph.D. in clinical psychology "with a medical minor" and study in "a collateral field in child development and child therapy" from the University of Minnesota. He is licensed in the State of Minnesota "as a consulting psychologist" and is "listed in the licensing procedure" as competent in "assessment diagnosis, teaching, research, [and] psychotherapy."

Dr. Underwager has written a number of books, including a recently titled book, *"Accusations of Child Sexual Abuse,"* and another book,

*C. and D. Exclusion of the defense psychologist's discussion of the "literature in the field" and "studies" regarding normal prepubertal vagina size, and exclusion of the social worker's videotaped interview of the alleged victim*

Here again we recognize the explicit codal provisions mandating the broad discretion of the military judge in controlling expert testimony. Mil.R.Evid. 702-05. Notwithstanding these provisions, we conclude here that the military judge erred in excluding critical defense evidence. Our ruling is predicated on the conclusion that this excluded evidence was proper rebuttal evidence.

■ We have stated in a whole series of cases: "It is well settled that the function of rebuttal evidence is to explain, repel, counteract or disprove the evidence introduced by the opposing party." *United States v. Hallum,* 31 MJ 254, 255 (CMA 1990); *United States v. Cleveland,* 29 MJ 361, 363 (CMA 1990); *United States v. Wirth,* 18 MJ 214, 218 (CMA 1984); *United States v. Strong,* 17 MJ 263, 266 (CMA 1984), all quoting or citing *United States v. Shaw,* 9 USCMA 267, 271, 26 CMR 47, 51 (1958) (Ferguson, J., dissenting). The scope of rebuttal is defined by evidence introduced by the other party. *See Michelson v. United States,* 335 U.S. 469, 69 S.Ct. 213, 93 L.Ed. 168 (1948); *United States v. Baldwin,* 17 USCMA 72, 37 CMR 336 (1967); *United States v. Sellers,* 12 USCMA 262, 30 CMR 262 (1961).

■ The record unequivocally establishes Dr. Underwager as an expert witness. The defense presented Dr. Underwager "as an expert in the following areas: clinical psychology, therapy, child development, child sexual abuse, and as a scientist." [20]

*"The Real World of Child Abuse Interrogations."* He has done research in the area of child interrogations with a report at the American Psychological Association Convention in 1986. A second area was research in "the use of the MMPI as an assessment device to get information about persons who are falsely accused and persons who are actual perpetrators of sexual abuse." Dr. Underwager has analyzed "the kind of therapy ... provided for children," including analyzing the records of 435 children, 305 of whom were under 7 years of age, to determine what therapy is being given when there is a

After cross-examining Dr. Underwager as to his qualifications for seven pages in the record, the trial counsel did not object to the court's recognizing Dr. Underwager in any of these areas.

The military judge precluded Dr. Underwager from testifying as to the "literature in the field" and "studies" regarding normal prepubertal vagina size.[21] The defense offered this expert testimony to rebut the prosecution's expert evidence that "references," "reference material," "various pediatric journals for reference articles," and "reference works" corroborate the prosecution witnesses' testimony regarding normal prepubertal vagina size. The government pediatrician, Dr. Richardson, in the prosecution's case-in-chief and in responses during cross-examination had based her opinion about normal prepubertal vagina size exactly on this sort of information.

Considering that the military judge exercised his discretion to permit the basis to support the expert testimony of Dr. Richardson, the defense was entitled to use Dr. Underwager to challenge this information. This ruling of the military judge continued to work to the disadvantage of the defense during trial counsel's cross-examination of Dr. Underwager. In one line of cross-examination, trial counsel questioned Dr. Underwager about physical evidence of penetration corroborating sexual abuse, but Dr. Underwager was unable to develop his challenge to the scientific reliability of data concerning "normal genitalia."

Dr. Underwager's testimony regarding this material was not to establish a specific measurement for a normal prepubertal vagina, but to attack the methodology and scientific basis for this reference material.

Moreover, the testimony of Dr. Smith, the government psychologist, about "ways to validate ... allegations of sexual abuse" identified physical evidence such as "trauma to the ... vagina" and an unusual dilation "of ... the vaginal canal ... that would tend to enhance the credibility of the female victim." Although Dr. Smith did not testify what constitutes an unusual dilation, his reference to this subject matter establishes it within the knowledge of experts in child sexual abuse and therefore a proper matter for Dr. Underwager's testimony. Considering Dr. Richardson's reliance on "references" and Dr. Underwager's knowledge regarding this subject matter, Dr. Underwager's discussion of literature was proper defense rebuttal.

Normal prepubertal vagina size was a critical issue in this case. The Government used two medical experts in its case-in-chief and one medical expert in rebuttal to testify about this specific matter. The defense challenged the medical authority and methodology to support the conclusions of the government experts.[22] The relevance of the defense-proffered evidence is unquestionable, so the defense had a right to attack the scientific bases for these expert opinions. *See generally Delaware v. Fensterer*, 474 U.S. 15, 106 S.Ct. 292, 88 L.Ed.2d 15 (1985).

In view of the above circumstances, we conclude that the military judge erred as a matter of law when he refused to admit the proffered defense evidence solely on the basis that Doctor Underwager was not a medical doctor. *See generally United States v. Crosby*, 713 F.2d 1066, 1077 (5th Cir.), *cert. denied*, 464 U.S. 1001, 104 S.Ct. 506, 78 L.Ed.2d 696

---

claim of child abuse. He has also published a paper on use of anatomically correct dolls with abused children. He has taken extra courses "in child development and child therapy under supervision." An integral part of his training was a medical minor.

21. The defense offer of proof establishes Dr. Underwager's knowledge of this material. We note that counsel could have strengthened his offer of proof by attaching the cited studies to the record as appellate exhibits to help educate the judge and assist on appellate review. However, this deficiency is not fatal.

22. For example, the defense cross-examined Dr. Richardson about her knowledge of "references" that might support her testimony. Normal prepubertal vagina size was contested by both counsel during closing argument. We note that defense counsel argued to the members a part of Dr. Underwager's testimony that was ruled inadmissible.

(1983). The defense did not call this witness as a medical expert who would testify as to the physical condition of B's vagina and the probable cause thereof. *See People v. Byrd*, 206 Ill.App.3d 996, 151 Ill.Dec. 905, 910, 565 N.E.2d 176, 181 (1990); *State v. Stanley*, 310 N.C. 353, 312 S.E.2d 482, 488–89 (1984); *State v. Starnes*, 308 N.C. 720, 304 S.E.2d 226, 233–34 (1983). Instead, he was called for the limited purpose of evidencing to the members the past and current state of the studies relied on by medical doctors and other professionals in the detection of child abuse. As the government expert had relied on "reference" authority to bolster her expert opinion testimony, Dr. Underwager's contradiction and discussion of this authority was certainly proper. *See* 3A Wigmore, *Evidence* § 992(2) at 927 (Chadbourn rev. 1970).

We further note that Mil.R.Evid. 702 does not provide that only persons with medical degrees can provide expert testimony on the physical condition of the human body and its causes. The standard provided in Mil.R.Evid. 702 is that a witness providing expert testimony be "qualified ... by knowledge, skill, experience, training, or education" and that the proffered testimony "will assist the trier of fact." *See United States v. Jones*, 26 MJ 197, 200 (CMA 1988); *United States v. Jackson*, 22 MJ 604, 607 (ACMR 1986). In this regard, the defense witness, Doctor Underwager, was qualified as an expert in clinical psychology, therapy, child development, child sexual abuse and as a scientist without objection by the prosecution. 36 MJ at 158. Also, the defense established in its proffer that Doctor Underwager, pertinent to his expertise noted above, had a specialized knowledge of the studies of "vaginal openings" which far exceeded those of the testifying medical doctors. Accordingly, resort to this source of specialized knowledge was not barred by any inflexible, medical-doctor rule.

▮▮▮ Our concern about the defense's opportunity to rebut the prosecution's case also pertains to the military judge's excluding the social worker's videotaped interview of the alleged victim. To rebut the prosecution evidence that corroborated B's credibility, the defense offered this videotape to support its position that manipulation of the child and improper interview techniques tainted B's testimony. The defense attempted to admit the videotape to contradict Ms. Tucker's testimony "that she asked open ended questions, non-suggestive, non-threatening environment." The defense sought

> to have Dr. Underwager review the tape and be able to point out to the court members just what types of actions by Mrs. Tucker are consistent with the defense['s] theory that the victim has been given certain cues, has learned a certain behavior; that in fact she has had her story bolstered, not bolstered but solidified by the type of questioning and interrogation conducted by the Government and by the private social workers and psychologists.

We faced a similar situation in *United States v. Jones*, 26 MJ 197 (CMA 1988). There, "[t]he central issue ... was the identity of the person who had perpetrated the assault." We held that, upon a defense request, a videotape of the victim's conversation with an expert witness was admissible to allow "the members to consider the degree to which the identification of appellant had been suggested to the victim." 26 MJ at 200. We concluded that "the military judge erred in denying defense counsel the opportunity to test the witness' testimony by playing the tape for the members." *Id.* at 200–01.

While in *Jones* the defense sought to have the members rely on their own viewing of the videotape to evaluate the witness' testimony, in the present case the defense attempted to have an expert, Dr. Underwager, testify using the videotape to explain improper influence on the victim. Although this defense use of the videotape is different from that in *Jones*, the difference is not significant.

Moreover, this is not a situation where appellant attempted to use the videotape to smuggle his own testimony before the

members without subjecting himself to the crucible of cross-examination. *Cf. United States v. Stark,* 24 MJ 381 (CMA 1987), *cert. denied,* 484 U.S. 1026, 108 S.Ct. 750, 98 L.Ed.2d 763 (1988). Here it was essential for the members to see the interview process in order for them to be able to understand and to evaluate the defense theory of the case. Additionally, the defense expert should have been permitted to use the videotape in his testimony to establish his points. *See also United States v. Hsieh Hui Mei Chen,* 754 F.2d 817, 824 (9th Cir.), *cert. denied,* 471 U.S. 1139, 105 S.Ct. 2684, 86 L.Ed.2d 701 (1985); *United States v. Tornabene,* 687 F.2d 312 (9th Cir.1982).[23]

We recognize that Dr. Underwager was permitted to testify about the videotape. However, the military judge instructed Dr. Underwager to "limit" his "response to what you saw with the effects on the child and the attempts by the individual without giving specific examples." This ruling further diminished the defense opportunity to use the videotape to challenge the prosecution's case. How could the expert support his conclusions "without giving specific examples"? *See United States v. Jones, supra.*

The fundamental defense position at trial was that B "learned a certain behavior ... [and was] encouraged, consciously or unconsciously, to develop a tale...." The defense argued that Ms. Tucker or Ms. Jackson gave B "a cue or some type of instruction," "encouragement," and "tried to reinforce" B who "was nothing more really than a puppet." Trial counsel countered that "[t]here was no suggestibility involved." As the alleged manipulation of B was such a hotly contested issue, we conclude that Dr. Underwager's testimony was not an adequate substitute for viewing the videotape. Ironically, trial counsel made a poignant appeal to the members to remember "what we all saw" in the "form of non-verbal communication" in his argument to bolster the prosecution's case. This cogent argument for the power of "non-verbal communication" supports our finding of error in the exclusion of the defense videotape evidence.

Finally, the military judge's assertion that the videotaped interview was not representative of the victim's pretrial interviews did not justify its exclusion at appellant's court-martial. This interview, although filmed by the Army Criminal Investigation Command for purposes of an Article 32 investigation, was nonetheless conducted by a state social worker. She testified that things were done "differently" in the sense that dolls were used, but she did not testify that this interview technique or any others employed were suggestive or leading. Moreover, regardless of the representative character of this interview, it contained the victim's previous recantation of her accusations against her father and constituted an integral step leading to the alleged victim's testimony at trial. Thus, the videotape was offered to contradict or to complete Ms. Tucker's testimony about the videotaped interview.

A final matter that we have considered in evaluating the military judge's exclusion of the videotape was the judge's admitting, over defense objection, as a prosecution exhibit, the 24–page book, *The Secret.* This book repeated the Government's case. Written as a "powerful tool" for the clinical setting, it was also powerful evidence to support the prosecution theory. The military judge's admitting *The Secret* as a prosecution exhibit is irreconcilable with his excluding the videotape. If the mem-

---

**23.** We are troubled that the record does not reveal whether the judge personally viewed the videotape prior to ruling it inadmissible. Therefore, we cannot determine if he had an adequate foundation for denying appellant's request to play the videotape. We gratuitously recommend that judges explicitly state on the record whether they have viewed videotapes or reviewed transcripts of them. Additionally, we encourage use of transcripts reported in *Hsieh Hui Mei Chen* as an aid in presenting evidence with audio dialogue and suggest that the military judge indicate if he or she has viewed or listened to the proffered evidence prior to ruling on its admissibility. Where, as in the present case, the audio is poor, a transcript could assist both the trier of fact and appellate courts.

bers were to consider evidence that could have influenced the testimony of the child, the judge should not have limited it to consideration of the book, *"The Secret."* The court members should have been permitted to observe how Ms. Tucker used the book in the videotaped interview.

We have viewed this videotape and conclude that it was admissible, as in *Jones,* to afford the defense the opportunity to test the witness' testimony. On the video B provides the following arguably exculpatory evidence: (1) She denied that her father "touched her private parts"; (2) she stated that she does not remember what she said about a "touching"; (3) after demonstrating with dolls the act of sexual relations, she denied that anything like this had happened to B; and (4) she denied having a conversation about a "secret." Considering B's denials and recantations on the videotape, we do not view this as evidence that only substantiates her allegations.

However, we concede that, when seen on the videotape, even these statements could be construed as inculpating appellant. But the legal question before us is not which of these theories is more worthy of belief but, rather, whether appellant had a fair trial when evidence in support of his theory was improperly excluded. Our concern is that the members have the opportunity to evaluate the evidence supporting the contentions of the contending experts and parties. We conclude here, as in *Jones,* that the ruling of the military judge denied the defense the opportunity to test the Government's case.

## IV

### PREJUDICE

 This leaves us with the question of prejudice. Not every exclusion of material evidence is *per se* reversible error. *United States v. Weeks,* 20 MJ 22, 25 (CMA 1985). Each case must be evaluated by comparing the whole record to the evidence excluded. In *Weeks* we adopted a test for determining specific prejudice when considering evidentiary questions. This test weighs the relative strength of the Government's case against "the defense's theory of the case"; "the materiality" of the evidence; and "the quality" of the excluded evidence.

 This was a contested case where appellant consistently denied the allegations. There were no independent witnesses to the alleged offenses. B was impeached with her contradictory and inconsistent statements, and the defense presented evidence that B was "not always" honest. Finally, there was an issue of another man's possibly molesting B.

This case presented the classic "battle of the experts," with the Government using six experts to corroborate B's testimony and the defense using one expert to rebut the Government's case and to attack B's story. Significantly the prosecution's expert evidence included testimony about three critical matters: (1) characteristic "profile" evidence to establish appellant's guilt; (2) prepubertal vaginal opening size supported by "references" to establish the authority of this opinion; and (3) B's credibility and testimony free from pressure and improper influence.

The military judge erred by admitting improper prosecution evidence regarding profile while excluding essential defense evidence regarding each of these matters. The military judge erroneously admitted the prosecution's characteristic profile evidence, and trial counsel's impermissible exploitation of this inadmissible evidence permeated this trial. Also the military judge erroneously excluded defense evidence that challenged the "reference" authority for normal prepubertal vagina size and the videotape that arguably supports the defense position of improper manipulation of B. These latter two rulings erroneously limited the defense's opportunity to challenge two significant thrusts of the prosecution's case.

 We hold, therefore, that this case "falls ... within the ambit of the doctrine of cumulative error—under which a number of errors, no one perhaps sufficient to merit reversal, in combination necessitate

the disapproval of a finding." *United States v. Walters*, 4 USCMA 617, 635, 16 CMR 191, 209 (1954). This Court will not lightly find reversible error in any case; however, we have been constrained on occasion to reverse a conviction because of the effect of cumulative errors found in the record of trial. *E.g., United States v. Donohew*, 18 USCMA 149, 39 CMR 149 (1969); *United States v. Yerger*, 1 USCMA 288, 3 CMR 22 (1952).[24]

■ As we stated in *Yerger*, "[W]e 'cannot say, with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error, ...'" 1 USCMA at 290, 3 CMR at 24, quoting *Kotteakos v. United States*, 328 U.S. 750, 765, 66 S.Ct. 1239, 1248, 90 L.Ed. 1557 (1946). Because this case presents the situation where the cumulative errors denied appellant a fair trial, we are required to reverse the decision below. *See* Art. 59(a), UCMJ, 10 USC § 859(a).

## V

## DECISION

The decision of the United States Army Court of Military Review is reversed. The findings and sentence are set aside. The record of trial is returned to the Judge Advocate General of the Army. A rehearing may be ordered.

Chief Judge SULLIVAN and Judge GIERKE concur.

Judge COX dissents and may file an opinion at a later date. *See* 36 MJ at 171.

Judge CRAWFORD dissents and will file an opinion at a later date. *See* 36 MJ at 178.

COX, Judge (dissenting): *

If this case were about the issue before the Court, I would not need to write a separate opinion. The granted issue forthrightly asks: "Whether the military judge erred to the substantial prejudice of appellant *by refusing to allow the defense to rebut* prosecution evidence, thereby denying appellant a fair trial." (Emphasis added.) Initially I, too, thought the military judge might have been a bit too hasty in excluding the three items of *defense rebuttal*—the evident subject of the granted issue; hence my willingness to review the case. Closer examination, however, has convinced me that the judge had good and sufficient reasons for each of his rulings under the circumstances of this case. Had the majority contented itself with resolving these fact-specific matters, little damage to the law could have resulted, and I might have recorded my contrary views most succinctly.[1]

**24.** *See also United States v. Weber*, 20 USCMA 82, 42 CMR 274 (1970); *United States v. Scott*, 19 USCMA 383, 41 CMR 383 (1970); *United States v. Lowery*, 19 USCMA 245, 41 CMR 245 (1970); *United States v. Evans*, 18 USCMA 3, 39 CMR 3 (1968); *United States v. Williams*, 12 USCMA 376, 30 CMR 376 (1961); *United States v. Bigelow*, 11 USCMA 527, 29 CMR 343 (1960); *United States v. Mulvey*, 10 USCMA 242, 27 CMR 316 (1959); *United States v. Tucker*, 9 USCMA 587, 26 CMR 367 (1958); *United States v. Williams*, 8 USCMA 328, 24 CMR 138 (1957); *United States v. Smith*, 3 USCMA 15, 11 CMR 15 (1953); *United States v. Larry*, 2 USCMA 415, 9 CMR 45 (1953); *United States v. Perna*, 1 USCMA 438, 4 CMR 30 (1952); *United States v. James*, 1 USCMA 379, 3 CMR 113 (1952).

* This opinion was filed after release of the majority opinion in order to permit further consideration of the issues that was not possible during the closing days of the term of Court. It was circulated to the other judges on November 2, 1992.

1. In brief, I agree entirely with Judge Crawford's resolution of these matters. The impression left by the majority opinion seems to be that the defense was permitted to introduce no evidence in "rebuttal" and indeed very little evidence at all. To the contrary, the evidence the majority views as so offensive and so in need of rebuttal—Dr. Smith's alleged "profile" testimony—was the primary subject of Dr. Underwager's approximately 4–hour rebuttal testimony. If "family" or any other "profile" evidence needed rebutting, it was rebutted.

Of course it was no alleged "family profile" that the defense wanted to counter with what Dr. Underwager acknowledged to be an "MMPI profile." Appellant's responses on an MMPI [Minnesota Multiphasic Personality Inventory] test compare to a claimed "family profile" as apples do to oranges. Nonrebuttal apart, how-

For reasons not entirely clear, however, the majority has not seen fit to confine itself to the propriety of the defense rebuttal. Instead, the majority reaches outside the framed issue to test the *initial admissibility* of the supposedly antecedent *government* evidence. 36 MJ at 160. Of course, this Court could have identified that question for consideration if we wished, but we did not. Not surprisingly, therefore, the parties to this appeal have not focused on this matter. The result is that the majority, in effect, blind-sides the prosecution. In addition, in order to reach this result, the majority perforce glosses over another salient feature—the fact that the defense did not object to admission of this prosecution evidence at trial.[2] Why

ever, the evidentiary validity of this item was adequately resolved in the majority opinion and requires no further comment.

The second "rebuttal" claim—that Dr. Underwager should have been allowed to mount the witness stand and start spouting scientific hearsay—is similar to the claim in *United States v. King*, 35 MJ 337 (CMA 1992). Certainly the defense here was proffering no learned-treatise exception to the hearsay rule—for no "treatise" has ever materialized. *See* Mil.R.Evid. 803(18), Manual for Courts–Martial, United States, 1984. And the hearsay assertions were certainly not being touted as a basis for the witness' expert opinion—Dr. Underwager, a psychologist, never claimed to be an expert on infant vaginal size (unlike the pediatricians and gynecologists who testified for the prosecution). *See* Mil.R.Evid. 703.

In any event, *since these alleged studies have never been submitted,* what is the prejudice? Art. 59(a), Uniform Code of Military Justice, 10 USC § 859(a). Not being a physician myself, I am not prepared to assume that "unusual dilatation [presumably meaning dilation] of the introitus or the vaginal canal in a female victim commensurate with her age" is not a matter worthy of consideration in evaluating complaints of child sexual abuse. *See* text, *infra.* Parties asserting prejudice should be prepared to establish prejudice, not just claim it. This allegation of error should have been rejected summarily.

The final "rebuttal" item was the military judge's refusal to admit the videotape of the interview of the alleged victim, B. In this regard, the military judge was again absolutely correct, inasmuch as the defense proffer did not correspond with fact. In its case-in-chief, the prosecution elicited statements made by B to a social worker *during therapy.* The methodology of the social worker during therapy was explained fully at the court-martial and was the subject of extensive cross-examination.

The videotaped session, however, came much latter. As the investigation under Article 32, UCMJ, 10 USC § 832, approached, a concern arose as to whether B would be able to communicate under the pressures of the hearing. Therefore, it was decided to capture the essence of her testimony on a videotape. As was thoroughly explained at the court-martial, the social worker's approach and methodology were en-

tirely different at this video session. Here, the effort was simply to have B repeat her prior statements made over the course of the treatment process. No claim was ever made that this was a therapy session, that the interview techniques were at all similar to those of the prior therapy sessions, or that the videotaped statements met any exception to the hearsay rule. As it turned out, B was able to testify at the session under Article 32 (and the court-martial), so the prosecution never offered the videotape in evidence.

Nevertheless, the defense at trial wanted the videotape shown to the court members in conjunction with Dr. Underwager's testimony. The defense represented that the videotape session revealed the interviewer's techniques of asking leading questions and of not accepting undesired answers (*i.e.,* forcing B to keep trying until she made the response the interviewer wanted to hear). *The defense response was that this would show that the statements made during therapy were unreliable!* Again it was a case of apples and oranges. According to the clear evidence, the videotape sessions would not reveal the techniques of the therapy sessions. The military judge correctly assessed the situation, and he properly excluded the evidence on the basis proffered.

I cannot pass this videotape claim without making a personal observation. Having viewed the video myself, I am struck by the potential prejudicial impact on appellant of the victim's statements therein. Suffice it to say, if the military judge had played this tape to the court members, we would have had before us the much more substantial question of competence of counsel for introducing the tape. Prejudice in not receiving the videotape under these circumstances seems inconceivable.

2. As the majority somewhat alludes, the only discussion even touching on the issue arose when *Mrs. Banks,* appellant's wife, was on the stand. Trial counsel was delving into the intrafamily relationships in the Banks' household, and he was attempting to get Mrs. Banks to concede that appellant regularly beat B and her.

Upon trial defense counsel's objection to receipt of the *uncharged misconduct evidence,* the military judge picked up the ball and began challenging the prosecution's entire theory of

the majority is so intent upon reaching this holding; what they apparently mean by their insistent claim that the Government presented "profile" evidence; and what the implications of this decision on the law might be cause me to register these misgivings.

### Admissibility of Dr. Smith's Testimony—Part I

Since the majority finds Dr. Smith's testimony so abhorrent and has made its admissibility the key issue, the nature of that testimony ought to be described. As noted by the majority, the word "profile" does not appear in the testimony. Indeed, at no point in these proceedings was it expressed or intimated, either through Dr. Smith's testimony, through argument of trial counsel, or through the instructions of the military judge, that (a) the evidence suggested that appellant or his family fit some sort of a "profile" or that (b) there even was such a thing as a "profile" in this area. Moreover, labels such as "syndrome" and "sex

the case. In the process, the *military judge,* in a session under Article 39(a), UCMJ, 10 USC § 839(a), smoked out the prosecutor's thought of expressing a profile theory to the factfinder. Thereupon, this much-maligned military judge—*sua sponte*—abruptly cut the Government off at the pass—thusly:

In other words are you going to bring up that the accused has a profile of a sexual offender because he does a, b, c, and d; in which case *then that is inadmissible.* Because you can't bring up a character trait to prove that the individual acted in conformity with that.

(Emphasis added.)

Lest there be any doubt in anybody's mind, the judge repeated his ruling a page later:

Okay. When you're saying "character traits within the Banks family," are you going to keep it within family traits and family activities; i.e. dysfunctions within the family between husband and wife, dysfunctions between children, children assuming parental roles. *Things of that nature rather than specifically saying that because the accused does a, and the accused does b, therefore he's a sex offender.*

(Emphasis added.) Trial counsel acceded. Thus, in scope, the judge permitted testimony about family dynamics, but he specifically barred representations of profile.

In consequence, though not raised by the defense, the "profile" idea was clearly identified in an Article 39(a) session—and ruled out. With

abuse syndrome" did not appear in Dr. Smith's testimony until brought up by the defense on cross-examination. (When asked by defense counsel, Dr. Smith promptly rejected the diagnostic validity of such concepts.) Dr. Smith's actual testimony can be broken into three areas.

### A. The "Risk Factors"

First, trial counsel asked Dr. Smith whether, in his "opinion," there were "any factors that may exist in the home that may increase the risk of sexual abuse occurring." Without defense objection, Dr. Smith identified three:

In culling through all of the data there seemed to be certain things [e]merging that increase the risk for a child to be the victim of a sex abuse. One of the factors appears to be where there is only one biological parent in the family. Another factors that occurs is that there is a stepfather in the family. A third factor that tends to increase the risk for abuse within the family is to be [sic] a marital dysfunction.

this ruling in its pocket, what did the defense do? It was not until 150 pages later in the record of trial that Dr. Smith was even called to the stand as a prosecution witness. If the Government was trying to smuggle in "profile" testimony through Dr. Smith, here surely is where we would expect to find an objection—for nothing could be clearer than that the military judge had expressly forbidden such a claim! Yet there was no objection. Indeed, during the entirety of Dr. Smith's testimony on direct-examination (19 pages in the record of trial), the sole defense objection—which the military judge promptly sustained—went to one unrelated hypothetical question. *Never* did the defense object that Dr. Smith's testimony amounted to some sort of "profile." *Never* did the defense complain that his testimony violated the military judge's prior rulings. On cross-examination, moreover, the defense promptly took Dr. Smith right back through his direct testimony; and, during the defense case-in-chief, the defense took its own expert, Dr. Underwager, right back into all the same areas.

Why the defense did not object to the testimony is not difficult to speculate. First, no "profile" was presented. Second, the defense case-in-chief was built almost entirely around the testimony of Dr. Underwager; objecting to Dr. Smith's testimony would have militated against presentation of the defense case. Whatever the reason, there was plainly no defense objection at trial to Dr. Smith's testimony.

Dr. Smith went on, spontaneously, to state shortly thereafter:

Now as I talk about this, it increases the risk of sex abuse; certainly it doesn't mean that sex abuse will occur.

Direct examination follow-up and cross-examination on this aspect of Dr. Smith's testimony were perfunctory.

### B. "Phases" of Child Abuse

The second focus of Dr. Smith's direct examination, again without defense objection, related to whether, in Dr. Smith's opinion, there was "a sequential response, a series of responses that an abused child seems to go through." In a lengthy narrative, Dr. Smith responded that there were generally considered to be "about five phases" in a child "sexual abuse experience." First is the "phase ... called the engagement phase," where "the perpetrator elicits the behavior from the child victim." Second is the "phase" called "the sexual activity phase," where the sexual conduct actually occurs. "The third phase ... tends to be what's called the secrecy phase," where the perpetrator seeks to assure the silence of the victim. "The fourth phase is called disclosure," where the conduct gets reported or discovered. The final "phase" is called the "suppression phase ... where it seems like every dynamic within the child, within the child's family, within the perpetrator, is to suppress the evidence of the allegation."

Specifically, in none of these "phases" was any typical manner of occurrence suggested. Each "phase" was postulated as having numerous possible manifestations. For example, in the "disclosure" phase, the victim might tell someone; the perpetrator and the victim might be discovered in the act by someone else; or the victim might contract venereal disease, etc. Similarly, in the so-called "suppression" phase, multiple and divergent behaviors and manifestations were postulated as possible. At no point was it intimated that the occurrence of any given set of "factors" warranted a conclusion that child sexual abuse had occurred.

Regarding these multiple behavior possibilities of the final phase, Dr. Smith stated on cross-examination:

The research shows that there have been enormous attempts to be able to identify specific behavioral symptoms that go along with sex abuse. I mentioned several. There's a whole list that's even long[er] than that. Unfortunately, most of these behavioral symptoms you'll find in children undergoing any kind of trauma or significant stress.

The military judge further anchored this aspect of Dr. Smith's testimony:

Q. Doctor, these behavioral indicators that you discussed, am I correct that they are related to a stress or a trauma in the family?

A. That's correct.

Q. That could be sexual abuse but it could be any other factor.

A. That's right.

Nothing in this section of Dr. Smith's testimony remotely suggested the existence of any type of child sexual abuse or abuser "profile."

### C. Credibility Evaluation

The final aspect of Dr. Smith's direct-examination testimony, again without defense objection, concerned the manner in which the credibility of an alleged victim is evaluated by psychotherapists. Not having ever examined B, Dr. Smith certainly offered no opinion as to her credibility. *Cf. United States v. Arruza*, 26 MJ 234 (CMA 1988), *cert. denied*, 489 U.S. 1011, 109 S.Ct. 1120, 103 L.Ed.2d 183 (1989); *United States v. Petersen*, 24 MJ 283 (CMA 1987). Instead, he was asked about the ways psychotherapists seek to validate claims of child sexual abuse. He described how, not so many years ago, experts tended to assume the truth of child sexual abuse allegations—but no more! He explained that experts now look to many factors to help them decide whether the child is telling the truth. These "factors" include such items as: whether the perpetrator confessed; whether there was "hard medical evidence," such as semen in the child's vagina,

venereal disease, etc.; whether there was "unusual dilatation [presumably meaning dilation] of the introitus or the vaginal canal in a female victim commensurate with her age"[3]; whether the misconduct was described as a single event or as "a progression of incidents over time from less intimate to more intimate behavior"; whether the child explained the conduct in "sexual detail," as opposed to only saying, "My daddy had sex with me"; and so forth.

Again, there was no intimation that any combination of "factors" projected any sort of a "profile"—there was no "a, b, c, d." See n. 2, supra.

### D. "Profile" Evidence

What then could the majority mean when they insist that a "profile" was presented in this case and that appellant was denied a fair trial thereby? Since no such claim was ever articulated[4] to the factfinder, I have to presume that the majority sees some sort of implicit "profile" within Dr. Smith's "risk factors," his "phases" of child sexual abuse, and his list of credibility-evaluation aids. Thus the groundwork was being laid for other evidence that some of these "factors" were present and operating in this case. This combination of Dr. Smith's general testimony with case-specific, arguably corroborative observations apparently completes the loop and projects the forbidden "profile." Whether this "profile" is seen as ersatz evidence in itself, having some weight of its own, or

merely as some sort of a syllogistic link is not entirely clear.

I seriously doubt that it is possible to inject a "profile"—whatever that is—implicitly. For the purpose of this discussion, however, I assume a "profile," as used here, must have something to do with at least a semicoherent assertion that there is a certain list of "factors" which would, if present in certain combinations, indicate the existence of some other significant matter. For example, in the case of the infamous "drug courier profile," the express representation, generally, is that the presence of certain readily observable factors (usually innocuous or ambiguous in themselves) so signifies the presence of illicit drugs that the Constitutional requirements for various degrees of detention and searches are ipso facto satisfied. See Florida v. Royer, 460 U.S. 491, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983); United States v. Belcher, 685 F.2d 289 (9th Cir.1982). In the case of a child-abuse/abuser profile, presumably, the representation would be that there is a certain combination of factors which indicate that abuse has occurred. Thus, proving the factors would arguably tend to prove the crime.

The problem I have with the majority's approach is the apparent conclusion that scientific background testimony plus "corroboration" equals a "profile," and that "profiles" are generally evil per se.[5] In so doing, the majority makes no allowance at all for standard "major premise" expert

---

**3.** It was apparently in response to this reference that the defense wanted to use Dr. Underwager to describe the studies he had read, which presumably related to variances in the vaginal sizes of young girls. See n. 1, supra.

**4.** The majority cannot seriously contend that trial counsel set up a "profile" claim in closing argument. As noted by Judge Crawford, trial counsel's argument came after trial defense counsel's lengthy closing peroration, in which he accused the Government of asserting all manner of fanciful theories, including "profile." Trial counsel's rejoinder, however, was a specific disavowal of all such theories. His lone statement that the long-term marital dysfunction between appellant and his wife "[c]onsistent with what you would expect to find in families where

the dad is abusing the child" is hardly the equivalent of saying: There is a "profile" of child sexual abuse; this is what it consists of; and appellant fits it. The majority's out-of-context citation of this comment underscores their apparent conviction that "profile" cannot only be raised implicitly, but even in the face of an explicit disavowal.

**5.** I trust the majority is not here signaling a movement to banish preemptively wholesale categories of potential expert testimony, without regard to context and the purpose for which they are offered, and without affording the parties an opportunity to litigate relevance, reliability, helpfulness, and such other matters as relate to admissibility. See, United States v. Gipson, 24 MJ 246 (CMA 1987).

testimony. *See* Imwinkelried, *A Comparativist Critique of the Interface Between Hearsay and Expert Opinion in American Evidence Law,* 33 Boston College L.Rev. 1 (1991); Mil.R.Evid. 702, Manual for Courts–Martial, United States, 1984. Indeed, it is precisely as used in this court-martial that all major premise expert testimony is received to assist factfinders in understanding scientific background, when such assistance will help them evaluate evidence before them. Thus a physician who has not examined a victim or plaintiff, but who describes the characteristics of broken bones, would, under the majority's theory, be presenting profile testimony—if other evidence in the case is offered to prove that the characteristics were (or were not) present. Similarly, a psychiatrist who has not examined the subject, but who describes the characteristics of a certain mental disorder, is actually presenting profile testimony—if other evidence is offered to show that the characteristics were (or were not) present.

Contrary to the majority view, the testimony in the foregoing examples is generally admissible, not because a "profile" is or is not presented, but because the logical syllogism is valid. Merely labeling testimony as "profile," as the majority does, is no answer. There is no rules of evidence defining "profile" evidence or delimiting its admissibility. The primary rule of evidence at play here is simply Mil.R.Evid. 402 entitled, "Relevant evidence generally admissible; irrelevant evidence inadmissible."

### Admissibility of Dr. Smith's Testimony—Part II

Notwithstanding the absence of meaningful counsel input on the admissibility question and ignoring defense waiver for the moment, I, too, will hazard some thoughts about the propriety of Dr. Smith's testimony since the majority has claimed that license. Rather than sweeping broadly with labels, however, I will apply the approach I took in a trilogy of recent opinions: *United States v. Suarez,* 35 MJ 374 (CMA 1992); *United States v. King,* 35 MJ 337 (CMA 1992); *United States v. Johnson,* 35 MJ 17 (CMA 1992). That approach involves examining each piece of the expert's testimony for purpose and relevance, and requiring limiting instructions where appropriate. As I admonished in *United States v. King, supra* at 342:

> The evaluation of expert testimony does not end with a recitation of academic degrees. *Everything the expert says* has to be relevant, reliable, and helpful to the factfinder. A rational and demonstrable basis is the *sine qua non* of expert opinion.

### A. The Risk Factors

Regarding the "risk factor" section of Dr. Smith's testimony, both parties might have made the record of Dr. Smith's testimony more excerpt-proof, but his meaning was plain enough. Clearly, what he was indicating was that, within that subset of cases in which child sexual abuse has actually occurred, these three (or is it two?) "factors" seemed to recur. He was not asked about the general incidence of child sexual abuse in families where there is a stepfather and marital dysfunction.

I assume that rate to be rather low in the overall population. Therefore I suppose it could be argued that appellant's status as stepfather, coupled with the Banks' marital dysfunction, tends to prove that child abuse did *not* occur.[6] *See generally* 1 J. Myers,

---

6. Claiming no originality of thought, I offer this scenario: Assume it can be shown that the only recurrent identifiers of child sexual abusers are red hair, blue eyes, and left-handedness. Assume also that, in 50% of the cases in which child abuse has actually occurred, the abuser bore these features. Assume further that 50% of all people having these three characteristics are actual child abusers, but that the other 50% are not. What does it prove if the accused has red hair, blue eyes, and is left-handed? Is the accused more likely or less likely to have abused a given child? Obviously we do not know, for the characteristics do not help us decide into which subset of red haired, blue eyed, left-handed people the accused fails. Even if the abuse figures ran as high as 90%, they would still not shed any light on whether the accused was in the 90% group or the 10% group. Marital dysfunction, a single biological

*Evidence in Child Abuse and Neglect Cases* § 9.50 (1992). I do not read Dr. Smith as intimating otherwise.

It is interesting to note that, as to the stepfather aspect, the defense expert, Dr. Underwager, agreed in large part. As he testified during the defense case-in-chief:

> What you do have is basically incidence figures. And that there is relatively high incidence of sexual abuse when there's a stepfather in the home.

Dr. Underwager's disagreement was with the label "risk factors" versus "incidence figures"; he also disputed the correlation with marital dysfunction. During Dr. Underwager's testimony, the point was much more forcefully made that these "risk" or "incidence" factors proved nothing. *See* n. 6, *supra*. On the whole, no one in the court room could have missed the meaning of both experts; no one could have regarded appellant's status as a stepparent and the fact of marital dysfunction as being significant evidence of guilt, as the majority seems to acknowledge. 36 MJ at 163. The "problem" with this sort of testimony is not that it is prejudicial, but that it proves so little. *See United States v. Johnson*, 35 MJ at 21. The claim that these isolated comments by Dr. Smith amounted to some sort of a "profile" to the prejudice of appellant, against the backdrop of this record, simply fails.

### B. "Phases" of Child Abuse

In general, Dr. Smith's "phase" testimony appears to be plainly admissible. As with the foregoing evidence, this was not testimony without context. Rather, this was a case featuring a youthful alleged victim who had apparently tolerated sexual abuse over a considerable period of time and who, at one point prior to trial, made statements indicating that either the inci-

dents did not occur or that somebody else had done it. This recantation became the primary focus of the defense attack on the alleged victim's credibility. The attack began with defense *voir dire*, and it carried right on through the defense opening statement, defense cross-examination of government witnesses, the defense case-in-chief, and defense closing arguments. Even though the defense failed to object to Dr. Smith's testimony, *see* n. 2, *supra*, trial counsel twice explained that his reason for presenting the testimony was to account for the recantation and, hence, counter the attack on the victim's credibility.[7] In these circumstances, testimony of this sort is admissible to explain that a victim's recantation does not necessarily establish that the conduct did not occur. *See United States v. Suarez, supra;* Myers, Bays, Berker, Berliner, Corwin, & Saywitz, *Expert Testimony in Child Sexual Abuse Litigation*, 68 Neb.L.Rev. 1, 68 (1989). Dr. Smith did not suggest that a victim's recantation was proof that abuse had occurred. If a better instruction might have been fashioned, none was requested by the defense, and no objection was raised as a to the instructions given. Any instructional deficiency might be tested for plain error. *United States v. Fisher*, 21 MJ 327 (CMA 1986). The evidence, however, was apparently admissible.

### C. Credibility Evaluation

For the same reason, Dr. Smith's testimony regarding credibility-evaluation techniques was apparently admissible. The defense cannot blast away at a victim's credibility and, at the same time, expect to bar the prosecution from pointing out ways for the factfinder to determine credibility. Of course, the defense did not try to bar this evidence at the court-martial, but the majority has. Again, any instructional error

---

parent, and stepparenthood are no different talismanically. Maybe they shed some light on *why* a particular person is prone to behave in a certain way, but they shed little light on *whether* abuse occurred or *whether* a certain person is an abuser.

7. A major undercurrent of this court-martial was appellant's apparent disobedience of an order to stay away from B—and the pressure put on her during this interim. For approximately one month after the allegations came to light, appellant continued to stay with the victim and her mother, and he had exclusive access to B for extended periods.

was waived, but it might be tested for plain error.

### Part III—Prejudice

Finally, the majority does not see fit to subject their conclusions of error to any sort of prejudice test *vis-a-vis* the evidence of record, presumably due to the host of errors they perceive. Given my view that the defense evidence in issue was properly rejected, *see* n. 1, *supra,* and that the defense waived any objection to Dr. Smith's testimony and the military judge's instructions, *see* n. 2, *supra,* I would have at least expected an assertion of plain error as a basis for unilaterally providing appellant relief. *United States v. Fisher, supra.* As noted, I find very little that was objectionable in Dr. Smith's testimony, and that part of his testimony which might be questioned is *de minimis.*

Had I been testing for prejudice, I would not have failed to note that the court members heard B's 8–year–old playmate testify how B first reported the abuse to her. In addition, the members heard the testimony of this same friend's mother, B's babysitter. B related the complaint to the babysitter; and the babysitter had a confrontation with appellant—who promptly made a clear consciousness-of-guilt statement. Further, in addition to the numerous admissible hearsay statements made by B to physicians and social workers, the members heard another powerful consciousness-of-guilt statement made by appellant to one of the social workers.

Also, the members heard a statement made by appellant to a friend and co-worker that can only be classified as an outright admission of guilt. Moreover, the members heard from a succession of physicians whose views on the condition of this 7–year–old's vagina left little room for doubt. Finally, the court members had the opportunity to judge the performance of 7–year–old B herself, as she described on the witness stand how appellant forced his penis

into her mouth and how she threw up afterward. The members heard B admit on the stand that she had once said someone else did it to her, but that what she told the physicians and social workers was true. *See* n. 7, *supra.* If this 7–year–old was acting on the stand, cross-examination would have revealed it.

Even assuming that some aspects of Dr. Smith's testimony may have been off point and even assuming the military judge did not limit its use as tightly as possible, I would be unable, on this record, to find prejudice, much less plain error. Art. 59(a), UCMJ, 10 USC § 859(a). Had a challenge to the propriety of Dr. Smith's testimony been properly before this Court, such that counsel were permitted to set the issues in perspective, I am confident that the majority would not have so badly misconstrued and mischaracterized this record of trial.

In all respects, I join Judge CRAWFORD; and I dissent.

CRAWFORD, Judge (dissenting): *

The majority opinion holds that appellant was prejudiced by the military judge's rulings: (1) admitting the prosecution psychologist's expert opinion of a family "profile" of child sexual abuse; (2) excluding the defense psychologist's expert discussion of reference authority regarding normal prepubertal vagina size; and (3) excluding a videotaped interview of the victim. 36 MJ at 152. I disagree with the opinion's holdings and with its conclusion that appellant was prejudiced by the rulings of the military judge.

### I

*Admissibility of testimony of the prosecution psychologist (Dr. Smith) concerning family risk factors.*

In this case, a government psychologist, Dr. Smith, testified about several risk factors associated with child sexual abuse in

---

* This opinion was filed after release of the majority opinion in order to permit further consideration of the issues that was not possible during the closing days of the term of the Court. It was circulated to the other judges on October 13, 1992.

families, *i.e.*, marital discord and the presence of a stepparent. Because of this testimony, the majority characterizes Dr. Smith's entire testimony as "'profile' evidence" which unfairly attributes guilt to appellant. Perhaps the majority believes that, by mentioning the word "profile" more than 60 times in its opinion, it could make it so. But I think not, particularly where, as here, the testimony of this witness is viewed in its entirety. In addition to the risk factors, Dr. Smith testified extensively about the stages of an abusive sexual relationship with a child. The stages he discussed ranged from initiation of inappropriate contact through post-discovery behavior. The purpose of the testimony was to provide the members with a framework to understand how the charged offenses occurred and to understand the victim's behavior, including her recantation. At no time did Dr. Smith or trial counsel refer to the risk factors or these stages as a profile, and they were not relied upon to identify appellant as the perpetrator. In fact, Dr. Smith testified that existence of "risk factors" does not "mean that sex abuse will occur" and that risk factors must be corroborated by complaints, confessions, and "hard medical evidence," among other things.

In this case, Dr. Smith's testimony was not highlighted in trial counsel's closing argument but rather in defense counsel's closing argument. Defense counsel labeled Dr. Smith's testimony as "the model called the accommodation syndrome and the sex abuse syndrome." Trial counsel refused this label, stating that Dr. Smith "talked about different aspects of dysfunctional families and personality traits and whatnot" and then noted: "We're not trying to prove our case by looking at how [the victim] acted or how the accused acted in a home or the fact that the mother and [B] seemed to have sort of an unusual relationship, the fact that the mother did not seem to be a terribly strong or supportive individual." In short, trial counsel devoted one paragraph of a six-page closing argument to Dr. Smith's testimony.

We have already determined that it is necessary to review the entire record to determine "the risk of misuse" of "profile-like factors or patterns." *United States v. Johnson*, 35 MJ 17, 21 (CMA 1992). In *Johnson* our examination of the record of trial revealed the government expert's testimony was put in perspective by cross-examination and, indeed, brought "back to the realm of relevance." *Id.* at 20. Such an analysis should have been applied in this case. Had it been, I believe the conclusion we reached in *Johnson* would be inescapable here.

The majority either ignores or glosses over the record as a whole and fails to mention three important facts: (1) the defense psychologist, Dr. Underwager, was permitted to sit in the courtroom throughout Dr. Smith's testimony and, indeed, throughout the testimony of all the Government's expert witnesses, in order to assist defense counsel in cross-examination; (2) defense counsel proceeded to cross-examine Dr. Smith extensively, assisted by Dr. Underwager; and (3) Dr. Underwager testified in the defense case-in-chief for 4 hours, during the time he rehashed, refuted, and attempted to explain away the testimony of Dr. Smith, including the testimony about the risk factors. If we consider the entire record, which I believe we must, finding prejudice here amounts to an undeserved windfall for appellant.

II

*Admissibility of testimony of the defense psychologist (Dr. Underwager) concerning reference authority on prepubertal vagina size.*

When asked, Dr. Smith responded that there were studies verifying his testimony concerning risk factors in child sexual abuse. The majority opinion curiously finds these responses somehow to entitle Dr. Underwager, likewise, to testify about the basis for his opinion on normal prepubertal vagina size. This otherwise fetching argument is a *non sequitur* because Dr. Underwager was attempting to provide an

opinion regarding a subject for which he was not qualified as an expert.

To justify its holding, the majority enunciates a "four-part test" for admitting expert testimony based upon Mil.R.Evid. 702–705 and 403.** 36 MJ at 161. This four-part test, however, is erroneous in at least one of its four parts, namely, that the expert opinion must only be "based on a sufficient factual basis to make it relevant." In contrast, Mil.R.Evid. 703 provides that an expert opinion must be based upon facts or data "of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject." In addition, Mil.R.Evid. 702 requires a witness to be "qualified as an expert" on the subject in question in order to testify about that subject. Dr. Underwager was not qualified as, and he did not claim to be, an expert in the area of normal prepubertal vagina size. As the judge rightly recognized, this is a subject for medical experts. Indeed, the judge gave the defense the opportunity to call a medical doctor to testify on this matter, but the defense declined to do so. Hence, since Dr. Underwager was not qualified as an expert in this field, he was entitled neither to give his opinion nor to provide reference authority supporting his unqualified opinion.

Much ado has been made about the vaginal size of the 7–year–old victim in this case. If her vaginal measurement was the only medical evidence showing sexual abuse, this attention might be understandable. However, it was not. Once again we must consider the entire record. The Government presented the testimony of three pediatricians on this subject: Dr. Richardson, Dr. Moore, and Dr. Crandall. Dr. Richardson examined the victim in September, close to the time the incident was reported. She found evidence of sexual abuse in the laxity of the perineal muscles around the vaginal introitus and in her observation that the vaginal opening was 2–3 times larger than would be expected in a 7–year–old child. Dr. Richardson also examined the victim 5 months later and noted less laxity in the perineal muscles (which she associated with cessation of sex-ual abuse), a vaginal opening approximately 2 times larger than would be expected in a 7–year–old child, and a condition called vaginismus which made internal examination impossible (a condition which she associated with mature females with a history of sexual activity and which she noted to be absent in young children who have not been sexually abused). Dr. Crandall, Dr. Richardson's supervisor, was also present at the second examination and testified as follows:

Q. Was this finding of vaginismus significant to you, doctor, in your experience in the area of child sex abuse?

A. I've found that most children this age, when you examine them, are able to relax, allow you to insert a small—your small finger into the—at least get the labia apart so you can examine the hymenal ring and the urethra and be able to insert a finger and to feel if there's any damage, a small lubricated finger; and she was unable to do that, unable to allow us to examine the vagina digitally or with a finger.

Q. What's a lay person's name for the term vaginismus, Doctor?

A. This is—people would call someone—they would say frigidity, and it's an involuntary spasm of the muscles which control the opening of the vagina; and it also can be voluntary also. If anyone don't want to have intercourse, they'll tighten those muscles; but it also can occur involuntarily and we see it frequently in couples who have been married and have been sexually happy for some time when there's been a period of separation. . . .

Q. But you're speaking of adult women, you say.

A. Adult, married women. . . .

Based on this medical evidence, Dr. Crandall testified he was "ninety to ninety-five percent" certain that penetration had occurred.

Lastly, the victim's mother took her to an independent pediatrician, Dr. Moore, to be examined. Dr. Moore testified that he

** Manual for Courts–Martial, United States, 1984.

found the vaginal opening to be almost twice the size expected in a 7–year–old child. Additionally he found the victim to be uncooperative during his examination and found that she appeared to have been "coached" not to talk to him.

Examined in this context, the vaginal size evidence which the defense sought to have Dr. Underwager refute, pales in comparison to the testimony concerning the child's vaginismus condition, the laxity of the perineal muscles, and the evidence of "coaching," all of which are consistent with sexual abuse. In my view, the vaginal size issue was created as a smoke screen to avoid the other pertinent medical evidence of sexual abuse. The defense failed to refute the really important medical evidence. Therefore, I find no prejudice in failing to permit Dr. Underwager to present reference authority on vaginal size.

### III

*Admissibility of videotaped interview of the 7–year–old victim.*

While the majority opinion finds prejudicial error in the exclusion of the videotaped interview of the alleged victim, I find most telling appellate defense counsel's concession at oral argument that if defense counsel had been allowed to show the videotape at trial, the error claimed on appeal would have been ineffective assistance of counsel.

I also find compelling the military judge's rationale for excluding the videotape: that it was prepared four and a half months after the complaint and that it was not representative of a normal counseling session with the victim's therapist. Based upon this criteria, the military judge believed that the tape would mislead the members.

Further, in my opinion, nothing would have corroborated the victim's indictment of appellant more than that particular videotape. Therefore, I find no prejudice in its exclusion.

### IV

*Testing for prejudice.*

By focusing only on what it finds to be error in this case, the majority opinion fails to test for prejudice but instead only tests the prejudice. When testing an entire record of trial for prejudice, a discussion of all facts relevant to such a determination is not only fair to both parties, but also in the best interests of justice.

I would also offer the following additional observations. The majority opinion categorizes this case as "the classic 'battle of the experts,'" 36 MJ at 170, with six experts testifying for the Government and only one for the defense. These six government witnesses consist of: Ms. Jackson, an intake social worker from the Kentucky Cabinet for Human Resources; Ms. Tucker, a psychotherapist who treated appellant and his 7–year–old stepdaughter; Dr. Smith, a psychologist who testified about risk factors in family child sexual abuse; and the three pediatricians who testified about the medical evidence of sexual abuse. One of these pediatricians, Dr. Moore, was independently hired by the defense in an attempt to refute the medical testimony of the government pediatricians. The government witnesses were relevant and necessary to the Government's theory of the case. No defense request for expert assistance or additional defense experts was denied. The defense attempt to have an independent pediatrician, Dr. Moore, testify on their behalf failed. I see no reason to fault the Government for thoroughly preparing and successfully litigating its case.

The majority opinion also mentions the 7–year–old victim's contradictory statements about whether the abuse occurred. It does not mention, however, appellant's opportunity to bring about the contradiction by remaining in the home for approximately one month after the incidents were reported. Despite the fact that appellant had been ordered by his Command to live in the barracks, he frequently was at home alone with the children while his wife was at work. It also does not mention that the 7–year–old victim reported the abuse

consistently to an 8–year–old friend, a babysitter, her mother, a social worker, and a psychotherapist before ever "contradicting" herself.

Finally, the majority opinion mentions that the victim "was 'not always' honest." 36 MJ at 170. It does not mention, however, the admissions and acknowledgements of guilt made by appellant to the victim's babysitter, a social worker, a co-worker, and admitted at trial. It also does not mention the victim's vivid testimony at trial describing how appellant forced his penis into her mouth, making her throw up.

This case is not a "close call." The evidence of appellant's guilt is overwhelming and undiminished by the so-called errors noted in the majority opinion.

I would affirm the decision below.